**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE BRAINSTORM CELL THERAPEUTICS, INC. DERIVATIVE LITIGATION | Lead Case No.: 1:24-cv-01095-DEH |
| This Document Relates to: ALL ACTIONS | **DEMAND FOR JURY TRIAL** |

# VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs Serge Andrev, Barry Holtzman, and John Duncan Hamby ("Plaintiffs"), by Plaintiffs' undersigned attorneys, derivatively and on behalf of Nominal Defendant Brainstorm Cell Therapeutics Inc. ("Brainstorm Cell" or the "Company"), files this Verified Amended Consolidated Shareholder Derivative Complaint against defendants Chaim Lebovits ("Lebovits"), Stacy Lindborg ("Lindborg"), Ralph Kern ("Kern"), June S. Almenoff ("Almenoff"), Irit Arbel ("Arbel"), Menghisteab Bairu ("Bairu"), Jacob Frenkel ("Frenkel"), Anthony Polverino ("Polverino"), Malcolm Taub ("Taub"), Nir Naor ("Naor"), and Uri Yablonka ("Yablonka") (collectively, the "Individual Defendants" and with Brainstorm Cell, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Brainstorm Cell, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Lebovits, Lindborg, and Kern for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiffs' Amended Consolidated Complaint against the Individual Defendants, Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted

by and through Plaintiffs' attorneys, which included, among other things, a review of non-public internal corporate documents produced by Defendants to Plaintiffs' counsel,[1] a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Brainstorm Cell, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Brainstorm Cell's directors and officers from February 18, 2020 to September 27, 2023, inclusive (the "Relevant Period").

2. Brainstorm Cell is a Delaware corporation that is headquartered in New York. Brainstorm Cell is a clinal-stage biopharmaceutical company that purportedly develops autologous cellular therapies for the treatment of neurodegenerative diseases, including Amyotrophic Lateral Sclerosis ("ALS"), Progressive Multiple Sclerosis, Alzheimer's disease, and other neurodegenerative diseases. Brainstorm Cell developed NurOwn, a proprietary cell therapy platform that was purportedly designed for the treatment of many neurodegenerative disorders, including ALS.

3. In November 2016, Brainstorm Cell began meeting with the FDA to discuss the results of the Company's recent Phase 2 trial of NurOwn and the Company's plan for its Phase 3 trial (the "Phase 3 Trial"). The Company intended to use the results of the Phase 3 Trial to obtain

---

[1] References to "BrainstormDerivative_00000___" are to the Books and Records.

the necessary FDA approval to market NurOwn as a treatment for ALS. Brainstorm Cell's Chief Executive Officer ("CEO"), Defendant Lebovits, communicated directly with the FDA and attended the FDA meetings in person, essentially adopting the role of Brainstorm Cell's Head of Regulatory Affairs.

4. The Company decided that within the Phase 3 Trial, the primary efficacy endpoint should be the rate of change in Phase 3 Trial participants' ALS Functional Rating Scale ("ALSFRS") scores, which is a rating sale that measures an ALS patient's functional decline in various areas of motor function. The Company also decided that it would only enroll "rapid progressors" in the Phase 3 Trial for the patient population. The Company made this determination based upon an exploratory subgroup analysis of the Phase 2 trial results. The Phase 2 trial allegedly demonstrated that "rapid progressors" with more severe cases of ALS that had been treated with NurOwn showed better results than "slow progressors."

5. The Company met with the FDA on November 21, 2016, August 7, 2017, November 8, 2019, and February 5, 2020 to discuss the Phase 3 Trial. At these meetings, the FDA routinely stated that it disagreed with the Company's proposed primary efficacy endpoint for the Phase 3 Trial. The FDA recommended that the Company obtain a Special Protocol Assessment ("SPA") for the trial.[2] Additionally, the FDA told the Company that it should not enroll only "rapid progressors" because the Company's subgroup analysis suggested benefit to rapid progressors also suggested harm to slow progressors. The FDA stated that "these inconsistent effects are most likely

[2] SPAs are intended to improve the quality of new drug applications and biologic license applications by providing more certainty in the clinical protocol design process. The SPA affords an opportunity for the FDA and product sponsors to reach an agreement, prior to study initiation, on the design of clinical trials that are intended to form the primary basis for an efficacy claim in a product marketing application. An SPA indicates the FDA's concurrence with the adequacy and acceptability of the specific elements of the overall trial protocol design.

spurious." In other words, the FDA said that Brainstorm Cell's claims that NurOwn had "neuroprotective" effects were odd, as the NurOwn allegedly benefitted rapid progressors but harmed slow progressors. The Company generated this hypothesis from exploratory post hoc subgroup analyses of data from the Phase 2 trial. In the November 8, 2019 meeting, the FDA told the Company that these subgroup results "do not support that your product has any meaningful activity in the treatment of ALS" and "are most likely spurious and misleading, as is often the case for subgroup analyses."

6. In contravention to the FDA's advice, the Company enrolled only "rapid progressors" in the Phase 3 Trial, despite the FDA's warnings that doing so was not scientifically justified. The Company also did not obtain an SPA with the FDA and also implemented a primary efficacy endpoint that it knew the FDA disapproved of. Due to the fact that the Company enrolled only "rapid progressors" in the Phase 3 Trial, the Phase 3 Trial population became skewed towards individuals with severe ALS and therefore lacked a balanced patient population. Brainstorm Cell's choice to ignore the FDA contravened the agency's explicit advice as well as published guidance on conducting trials for ALS treatments. These guidance documents stated that trial sponsors should not unnecessarily exclude patients from trial enrollment based upon disease stage.

7. Despite the Company's non-compliance with the FDA's explicit guidance, Brainstorm Cell and its senior executives represented to investors that the Phase 3 Trial was "aligned with Current FDA views," and also that the FDA "commented that this is a well-designed trial." The Company did not disclose to investors the FDA's criticisms of the Phase 3 Trial.

8. Before the market opened on November 17, 2020, the Company announced results from the Phase 3 Trial. The Phase 3 Trial failed to reach statistical significance on its primary endpoint, despite the fact that the Individual Defendants claimed that it showed "numerical

improvements" across primary and secondary efficacy endpoints. Following this news, the Company's stock fell $7.88 per share from the previous day's closing price of $11.90 to a close at $4.04, amounting to a 66% decline.

9. While continuing to conceal the FDA's advice regarding the Phase 3 Trial's design, the Individual Defendants represented that the Phase 3 Trial "included a more severely affected ALS population" and stated that, "we identified a superior treatment response in a ***pre-specified*** subgroup of patients with less advanced disease."[3] The Individual Defendants also told investors that they were engaged in active discussion with the FDA, which was committed to prioritizing the review of data. The alleged "pre-specified" subgroup of patients consisted of patients with ALSFRS-R scores at 35 or above, or patients with mild ALS.[4] The subgroup of patients with ALSFRS-R score of 35 or over was a post hoc exploratory analysis, which focused on what is referred to as a "floor effect."[5] The Individual Defendants predicted that the lack of efficacy in the Phase 3 Trial overall was the result of the inability to detect efficacy in a subgroup that was, according to the Individual Defendants, impacted by the "floor effect."

---

[3] Unless otherwise indicated, all emphasis is added.

[4] ALSFSR, or the ALS Functional Rating Scale, is an instrument that is used for evaluating the functional status of patients with ALS. It can also be used to monitor functional change in a patient over time. The ALSFSR scale ranges from a minimum score of zero to a maximum score of 40. The higher the score, the more function the patient retained. Therefore, a patient with an ALSFRS score of 40 maintains normal functional status, and an ALS patient with a score of 35, as used here, experiences only mild functional decline.

[5] Bounded scales, like the scale used to measure ALSFRS, are sometimes subject to what are known as "ceiling" or "floor" effects. These effects prevent the scale from detecting further deterioration (or improvement) of a patient's function past the point of either extreme end on the scale. Once the functional status of a patient on the ALSFRS scale reaches zero, further decline in a patient's functional status cannot be measured, as it has hit the "floor" of the ALSFRS scale. This can make the effects of certain treatments difficult to measure in patients with low ALSFRS scores.

10. Unbeknownst to the public and investors, the subgroup used by Brainstorm Cell was not pre-specified. As stated by the FDA, "***pre-specification is the cornerstone of reliable regulatory evidence… Without a prespecified hypothesis testing strategy, [this subgroup] is an exploratory analysis… [which] cannot be used to rescue the trial because of a large chance of false positive finding***."

11. The Company's failure to follow the advice of the FDA concerning the Phase 3 Trial design and only enroll "rapid progressors" essentially enabled the Individual Defendants to manipulate the Phase 3 Trial in a way that created misleading false positive results to support the Individual Defendants' claim of efficacy for NurOwn. The Individual Defendants attempted to rescue the failed results of the Phase 3 Trial though a post hoc subgroup analysis by claiming that the Phase 3 Trial would have succeeded if not for the fact that the Phase 3 Trial population consisted of patients with more advanced ALS who "fell victim to the floor effect." Ultimately, the Individual Defendants excluded nearly 50% of the Phase 3 Trial data as a result of the "floor effect."

12. Brainstorm Cell held a teleconference with the FDA on February 21, 2021. The FDA first told Brainstorm Cell that the agency interpreted the Phase 3 Trial as a negative trial, submission of a Biologics License Application ("BLA") was improper, and that the data produced by the Phase 3 Trial did not meet the standard that the FDA requires to obtain approval. The FDA also discredited Brainstorm's "floor effect" analysis, explaining that the "suggested 'floor effect' did not appear consistent across the study population." The FDA also stated that if the Company intends to continue to develop NurOwn as a potential treatment for ALS, the Company should "***conduct another Phase 3 study, this time incorporated Agency input regarding the study design***." The FDA also stated that it "***remains concerned about the larger number of deaths***

***among subjects treated with [NurOwn] compared to that among subjects treated with placebo***." In fact, there were over three times as many deaths in the treatment group compared to the placebo group.

13. Prior to the market opening on February 22, 2021, the Company issued a press release that informed investors that the FDA "concluded from their initial review [of the Phase 3 Trial data] that the current level or clinical data does not provide the threshold of substantial evidence that FDA is seeking to support a [BLA]. In addition, FDA advised that this recommendation does not preclude Brainstorm from submitting a BLA." The Company also stated that it intended to consult with experts, regulatory advisors, and others prior to making the final decision as to whether to submit a BLA to the FDA.

14. Following this news, on February 23, 2021, the Company's stock fell $2.70 per share, from its previous market close price of $6.90 on February 19, 2021 to a closing price of $4.20, amounting to a 39% decline.

15. The Individual Defendants concealed information regarding the FDA's concern about the number of deaths in the Phase 3 Trial's treatment group, the existence of deaths at all, the FDA's invalidation of Brainstorm's "floor effect" analysis, and the FDA's recommendation that the Company conduct an entirely new trial that actually followed the FDA's advice concerning the design of the clinical trial. The Individual Defendants also left open the possibility of submitting a BLA, despite the FDA's clear advice against submitting one.

16. [redacted]

[redacted]

17. After remaining silent on the topic of submitting a BLA for roughly 18 months, on August 15, 2022, before market hours, Brainstorm Cell issued a press release announcing its submission of a BLA to the FDA for NurOwn for the treatment of ALS. The press release emphasized the effectiveness of NurOwn, representing, among other things, that "[n]ew clinical analyses strengthen the conclusions from NurOwn's Phase 3 clinical trial[.]" The Individual Defendants represented that a "correction" in the statistical analysis of the Phase 3 Trial data resulted in one of the "key" pre-specified endpoints reaching statistical significance, again referring to the "pre-specified efficacy subgroup of participants with a baseline score of at least 35." The press release also emphasized that this analysis carried a "***different level of credence***" because it was a "***pre-specified threshold***." The Individual Defendants also stated that "***efficacy subgroup analyses play an important role in the evaluation of NurOwn's treatment effect because of the higher number of participants enrolled in this clinical trial with advanced ALS at baseline***," further concealing that the FDA specifically told Brainstorm Cell not to enroll a patient population that was skewed toward "advanced ALS at baseline."

18. In discussing the future submission of a BLA, the Company also highlighted new biomarker analyses from the Phase 3 Trial. In ALS, a decrease in a biomarker known as Neurofilament Light ("NfL") is thought to be associated with a decrease in neurodegeneration, an ultimately positive occurrence. However, in the Company's Phase 3 Trial, a reduction in NfL

corresponded to a worse clinical efficacy result, which is the opposite of what is typically expected and also, ultimately, an undesirable result. However, the Individual Defendants continued to tout the biomarker data as "going in the direction that we expected with NurOwn and stability." Similar statements touting the effectiveness of NurOwn in the treatment of ALS were made by the Individual Defendants throughout the Relevant Period.

19. On September 9, 2022, Brainstorm Cell submitted the BLA to the FDA.

20. On October 12, 2022, after market hours, Brainstorm Cell issued a press release to announce the presentation of new biomarker analyses from its NurOwn Phase 3 ALS study.

21. The truth began to emerge on November 10, 2022 when the Company issued a press release entitled "BrainStorm Cell Therapeutics Receives Refusal to File Letter from FDA for its New Biologics License Application for NurOwn for the treatment of ALS." In the press release, Individual Defendants represented to investors that "***the FDA ha[d] not accepted [the Company's] BLA for NurOwn in ALS***" but that the Individual Defendants "remain committed to NurOwn's advancement as a treatment for this devastating disease." The Individual Defendants also noted that the Company intended "to request a Type A meeting and look[ed] forward to continued discussions with the FDA[.]" Additionally, in disclosing the FDA's Refusal to File ("RTF"), the Company stated that the RTF "included one item related to the trial not meeting the standard for substantial evidence of effectiveness and Chemistry, Manufacturing and Controls ("CMC") related items."

22. On this news, the Company's share price fell $1.22 per share, or 42.21%, from a closing price of $2.89 on November 9, 2022 to close at $1.67 per share on November 10, 2022.

23. Unbeknownst to investors, the RTF letter from the FDA informed the Company that, among other things, the BLA submission was "***scientifically incomplete to demonstrate***

***substantial evidence of effectiveness, and that the manufacturing information was grossly deficient to ensure product quality***." The RTF also detailed the array of "critical information" not included in the BLA, including "missing or inadequate control materials," "validation methods missing or incomplete," "lack of data demonstrating manufacturing consistency," "control strategy for prefilled syringe not provided," "inadequate testing and facility information," and "facilities not ready for inspection."

24. Following the announcement of the RTF, the Individual Defendants downplayed the RTF's contents, representing that the deficiencies in the BLA were "easily fixable," representing that the CMC issues were "trivial," and continued to tout NurOwn's safety and efficacy and its prospects for FDA approval. The Individual Defendants also continued to boast about the Phase 3 Trial's "positive" biomarker results and the importance of the results from the "pre-specified" subgroup of patients who had not been impacted by the "floor effect."

25. [redacted]

26. The Company held a meeting with the FDA on January 11, 2023, to discuss the deficiencies that had been identified within the RTF. At this meeting, the FDA definitively informed the Individual Defendants, responding to the "floor effect" analysis that "***the lack of efficacy of NurOwn over placebo cannot be explained by a floor effect… these findings from the exploratory subgroup analysis can only be used for hypothesis generation, not as evidence***

***of effectiveness to support*** approval." The FDA also presented the Company with two options, either submit a new BLA with evidence of safety and efficacy from new adequate and well-controlled clinical investigations, or request that the BLA be filed over protest. One week prior to this meeting, the Company's Chief Medical Officer, Defendant Kern, resigned.

27. The Company issued a press release on March 27, 2023, informing investors that it filed the BLA using the file over protest procedure, and "filed an amendment to the BLA which responds to most of the outstanding questions the FDA has posed." The Individual Defendants also represented that the Phase 3 Trial had "***fewer deaths than [the Company] expected. [The Company also had] a very strong safety profile***." The Individual Defendants also stated that during the meeting on January 22, 2023, the FDA provided the Company with "***multiple options to return the BLA to regulatory review***" and that "there was no downside utilizing the File Over Protest pathway."

28. That same day on March 27, 2023, the Company held a "Business Update Call," with investors. During the call, one analyst asked about the FDA's awareness of the "floor effect" and the potential impact it can have on clinical trials like the Phase 3 Trial. In response to this question, the Company's co-CEO, Defendant Lindborg, stated that "***The FDA has certainly seen this data and has clearly not disagreed with the statements we made.***" In the same call, the Individual Defendants represented the following regarding the Company's BLA: "[the BLA amendment] responds to the majority of the manufacturing items raised in the [RTF]," and that "[the Company has] conducted much of the work necessary in a short time frame." The Company also emphasized Brainstorm Cell's "exemplary record of high-quality manufacturing."

29. Ahead of the FDA Advisory Committee Meeting, the FDA released the Briefing Document on September 25, 2023 (the "Briefing Document"). The Advisory Committee Meeting

was held as planned on September 27, 2023, at which time the Advisory Committee members voted 17:1 against FDA approval of NurOwn.

30. During the Advisory Committee Meeting, Defendant Lindborg represented the Company. When asked about the CMC deficiencies, Defendant Lindborg stated, "***we acknowledge that additional work needs to be done and complete to fully satisfy the FDA requirements.***"

31. The FDA Briefing Document and the FDA panelists' comments at the Advisory Committee Meeting revealed the Individual Defendants' prior misrepresentations about Phase 3 Trial's designs and results, as well as the Company's interactions with the FDA. The Briefing Document and Advisory Committee transcript revealed that:

- Survival in the Phase 3 study was ***worse at study completion for subjects who received [NurOwn].*** A total of 13 deaths occurred during the post-treatment follow up with ***10 deaths in the [NurOwn] group and 3 deaths in the placebo group.***

- Particularly concerning was the larger number of deaths in the [NurOwn] group compared to the placebo group.

- ***FDA and applicant did not reach agreement on the primary efficacy endpoint for the Phase III study.***

- The Phase Two study failed to show a statistically significant benefit of [NurOwn] for treatment of ALS. However, the applicant conducted an exploratory subgroup analysis of rapid progressors versus slow progressors… ***FDA communicated to the applicant concerns about the definition of rapid progressors and the exploratory nature of the subgroup findings. However, the Phase Three study, the applicant then selected only patients who appear to be rapid progressors.***

- [NurOwn] showed no efficacy compared to placebo on primary and all key secondary endpoints in the overall population. BCT-002-US [The Phase 3 Study] was a failed study. ***The applicant then tried to rescue the failed study by exploring various subgroups.*** However, we reiterate the statistical principle that exploratory and post hoc subgroup analysis cannot provide substantial evidence of effectiveness to support regulatory approval because such analysis has ahigh risk of obtaining false positive results.

- The applicant, however, states that these sub-group analysis were "pre-specified." ***However, it is important to not that these subgroup analyses were not prespecified*** for hypothesis testing and no prespecified multiplicity adjustment strategy was employed. ***Subgroup tests following overall non significant tests in the population as a whole such as the Phase 3 study can only be considered exploratory and hypothesis-generating and do not constitute evidence of effectiveness to support marketing approval of [NurOwn].***

- …***Pre-Specification is the cornerstone of reliable regulatory evidence***. Without a prespecified multiple hypothesis testing strategy, ***the subgroup analysis of patients with baseline ALSFRS-R score greater than or equal to 35 is an exploratory analysis.*** In the presence of an overall negative trial result, this subgroup analysis may be used to generate a hypothesis for another trial. ***However, they cannot be used to rescue the trial because of a large chance of false positive finding.***

- The applicant's biomarker analyses were exploratory and ***did not support clinical benefit… [] a reduction in NfL is expected to be associated with reduction in clinical decline*** of ALSFRS-R total score. ***However, in the current data set, patients experiencing greater loss of function appear to have a higher reduction of NfL, the opposite of what would be expected.***

- [I]t is not appropriate to combine non-significant results into a significant trend because ***the more comparisons you make, the more likely one of them would have been statistically significant***. But in this case, none of them were. ***Perhaps most importantly, more patients takin the treatment died.***

32. Following the FDA releasing the Briefing Document on September 25, 2023, the Company's stock price fell $0.39 per share, from a closing price of $0.82 on September 22, 2023, the previous trading day, to a close of $0.43 on September 25, 2023, amounting to a 48% decline.

33. The truth fully emerged on September 27, 2023. That day, the Company announced in a press release the results of the FDA's review of its BLA, revealing that members of the Cellular, Tissue, and Gene Therapies Advisory Committee voted 17:1 that there was not substantial evidence to show NurOwn's effectiveness in treating ALS. The FDA Briefing Document further revealed that the Company had grossly downplayed the risks associated with NurOwn, stating that "***the submission was scientifically incomplete to demonstrate substantial***

***evidence of effectiveness, and that the manufacturing information was grossly deficient to ensure adequate product quality*.”

34. The same day, September 27, 2023, *Reuters* published an article entitled, “US FDA panel votes against BrainStorm's ALS therapy over effectiveness concern.” Lisa Lee, one of the panelists, stated, “providing false hope can be ethically problematic and false hope is provided when the probability of a positive outcome is overestimated. And I think that seems to be the case here.”

35. On this news, the Company’s share price fell $0.19 per share, or 48.72%, from a closing price of $0.39 per share on September 27, 2023 to close at $0.20 per share on September 28, 2023.

36. During the Relevant Period, the Individual Defendants breached their fiduciary duties to the Company by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company’s business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (a) the FDA had already invalidated Brainstorm Cell’s “floor effect” hypothesis which was based on misleading, post hoc analysis, as set forth above; (b) the CMA issues were not “trivial,” and instead, the FDA informed the Company in the RTF that manufacturing was “grossly deficient” and “critical information” was left out; (**c**) the FDA had raised other “red flags,” namely there were over three times the number of deaths in the Phase 3 Trial’s treatment group compared to placebo and more adverse events which raised serious safety concerns; and (d) as a result of the foregoing, the Individual Defendants’ statements about Brainstorm Cell’s business, operations,

and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

37. The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact.

38. Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

39. In light of the Individual Defendants' misconduct—which has subjected the Company, its both of its CEO, its former Co-CEO, and its former CMO to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York, which recently survived, in part, a motion to dismiss (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

40. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

41. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the CEO's, former Co-CEO's, and former CMO's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a

majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

42. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

43. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

44. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

45. Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiffs

46. Plaintiffs are current stockholders of Brainstorm Cell common stock and have continuously owned Company stock at all relevant times.

**Nominal Defendant Brainstorm Cell**

47. Brainstorm Cell is a Delaware corporation with its principal executive offices at 1325 Avenue of Americas, 28th Floor, New York, New York 10019. Brainstorm Cell's shares trade on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "BCLI."

**Defendant Lebovits**

48. Defendant Lebovits has served as the Company's CEO since September 2015 and as its President since July 2007.

49. For the fiscal year ended on December 31, 2020 (the "2020 Fiscal Year"), Defendant Lebovits received $2,125,854 in total compensation from the Company. This included $500,000 in salary, $860,000 in bonus, $486,174 in stock awards, and $278,680 in all other compensation. For the fiscal year ended on December 31, 2021 (the "2021 Fiscal Year"), Defendant Lebovits received $1,128,349 in total compensation from the Company. This included $500,000 in salary, $250,000 in bonus, $110,395 in stock awards, and $267,954 in all other compensation. For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Lebovits received $1,117,966 in total compensation from the Company. This included $500,000 in salary, $250,000 in bonus, $127,547 in stock awards, and $240,419 in all other compensation.

50. During the Relevant Period when the Company materially misstated information to the investing public to keep the stock price inflated and before the scheme was exposed, Defendant Lebovits made the following sales of Company stock at artificially inflated prices:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| July 7, 2020 | 3,500 | $13.12 | $45,937 |
| July 10, 2020 | 2,000 | $13.35 | $26,700 |
| July 13, 2020 | 40,000 | $13.52 | $540,960 |
| July 15, 2020 | 18,430 | $13.12 | $241,709 |
| July 16, 2020 | 7,823 | $13.47 | $105,352 |
| **TOTAL** | 71,753 | - | $960,658 |

Thus, in total, before the fraud was exposed, Defendant Lebovits sold 71,753 shares of Company common stock at artificially inflated prices on inside information, for which he received approximately $960,658. His insider sales, made with knowledge of materially nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

51. The proxy statement the Company filed on Schedule 14A on May 16, 2025 (the "2025 Proxy Statement") stated the following about Defendant Lebovits:

> Mr. Chaim Lebovits has served as our Chief Executive Officer since September of 2015, and has served as our President since January 2023. Mr. Lebovits joined the Company as President in connection with his arrangement of an equity investment by ACC BioTech in the Company in July 2007. On August 1, 2013, the Company appointed Mr. Lebovits as its Principal Executive Officer, and he assumed the duties and responsibilities of the Chief Executive Officer on an interim basis until June 2014. During his tenure with the Company, Mr. Lebovits has been instrumental in the various capital raises undertaken by the Company and in his capacity as President Mr. Lebovits managed relatively low burn rates and was very instrumental in the major decisions of the Company's focus and direction, including the decision to focus on Amyotrophic Lateral Sclerosis ("ALS", also known as Lou Gehrig's Disease) as a first indication. Mr. Lebovits led efforts to attract the clinical sites first in Israel and later in the United States, building strong relationships for the Company with many leading Key Opinion Leaders and Centers of Excellence for ALS in the United States. Mr. Lebovits controls ACC Holdings International, and its subsidiaries including ACC BioTech, which is focused on the biotechnology sector. He has been at the forefront of natural resource management and has spent years leading the exploration and development of resources

> in Israel and served as a member of the boards of directors of several companies in the industry. Mr. Lebovits has also held senior positions for the worldwide Chabad Lubavitch organization, the largest Jewish organization in the world today.

**Defendant Lindborg**

52. Defendant Lindborg has served as a Company director since May 2024. Defendant Lindborg previously served as the Company's Co-CEO from January 2023 until May 2024. Prior to this, Defendant Lindborg served as the Company's Executive Vice President and Chief Development Officer from June 2020 to January 2023.

53. For the 2020 Fiscal Year, Defendant Lindborg received $867,505 in total compensation from the Company. This included $218,750 in salary, $10,000 in bonus, $404,358 in option awards, $186,250 in stock awards, and $48,147 in all other compensation. For the 2021 Fiscal Year, Defendant Lindborg received $736,680 in total compensation from the Company. This included $469,000 in salary, $189,150 in bonus, and $78,530 in all other compensation. For the 2022 Fiscal Year, Defendant Lindborg received $851,543 in total compensation from the Company. This included $469,000 in salary, $164,150 in bonus, $143,150 in stock awards, and $75,243 in all other compensation.

54. The 2025 Proxy Statement stated the following about Defendant Lindborg:

> Dr. Stacy Lindborg was appointed as a member of the Board in May 2024. Dr. Lindborg joined the Company in June 2020 as Executive Vice President and Chief Development Officer. In January 2023, she was appointed to serve as Co-Chief Executive Officer until resigning from the position effective May 9, 2024. She also serves on the board of directors of Imunon, Inc. (formerly Celsion Corporation), a publicly-traded clinical stage biotechnology company. Dr. Lindborg previously served at Biogen Inc. ("Biogen") from 2012 to 2020, where she was most recently Vice President, Analytics and Data Science. She also served on the R&D governance team during a time of significant growth for Biogen, and was active in guiding the firm's long-term vision for growth through analytics and by stimulating innovative development platforms to increase productivity. Prior to her role at Biogen, Dr. Lindborg worked at Eli Lilly & Company, where she held positions of increasing responsibility. In her role as the Head of R&D strategy, she was responsible for characterizing the productivity of the portfolio and driving key R&D strategy projects

> including the annual R&D Long-Range Plan. Additionally, she was Leader of Zyprexa Product Management in which she was responsible for R&D, Commercial and Manufacturing plans. Dr. Lindborg holds a Ph.D. in statistics from Baylor University.

**Defendant Almenoff**

55. Defendant Almenoff served as a Company director from February 26, 2017 until December 2023. Defendant Almenoff also served on the Audit Committee until December 2023.

56. For the 2020 Fiscal Year, Defendant Almenoff received $30,000 in total compensation from the Company, which consisted entirely of fees earned or paid in cash. For the 2021 Fiscal Year, Defendant Almenoff received $43,560 in total compensation from the Company, which consisted of $30,000 of fees earned of paid in cash and $13,560 in stock awards. For the 2022 Fiscal Year, Defendant Almenoff received $30,000 in total compensation from the Company, which consisted entirely of fees earned or paid in cash.

57. The proxy statement the Company filed on Schedule 14A with the SEC on December 13, 2022 (the "2022 Proxy Statement") stated the following about Defendant Almenoff:

> Dr. June S. Almenoff joined the Company on February 26, 2017 as a director. Dr. Almenoff currently serves as the Chief Medical Officer at RedHill Biopharma Inc. (Nasdaq: RDHL), where she focuses on medical-commercial strategy and serves on the commercial executive team. She is on the investment advisory board of the Harrington Discovery Institute, a private venture philanthropy, Board Director to Avalo Therapeutics (Nasdaq: ATVX) and Tenax (Nasdaq: TENX). She previously served as a Board Director to Tigenix (Nasdaq: TIG, acquired by Takeda), Ohr Pharmaceuticals (Nasdaq: OHRP, merged with Neubase Pharmaceutical), Kurome, RDD Pharma, Furiex Pharmaceuticals. Dr. Almenoff previously served as Chief Medical Officer (CMO) and Chief Operating Officer of Innovate Biopharmaceuticals in 2018 and as President and CMO of Furiex Pharmaceuticals (acquired by Actavis plc) from 2010 to 2014. Prior to joining Furiex, Dr. Almenoff was at GlaxoSmithKline for 12 years, where she was a Vice President in the Clinical Safety organization, chaired a PhRMA-FDA working group, and worked in scientific licensing. Dr. Almenoff has also served as an advisor to numerous biopharma and venture capital organizations, and as a consultant to biopharma hedge funds. Dr. Almenoff received her B.A. from Smith College and graduated from the M.D.-Ph.D. program at the Icahn (Mt. Sinai) School of Medicine. She completed post-graduate medical training at Stanford University Medical Center

> and served on the faculty of Duke University School of Medicine. She is an adjunct Professor at Duke and a Fellow of the American College of Physicians (FACP). We believe Dr. Almenoff possesses specific attributes that qualify her to serve on our Board including her valuable leadership skills and her deep knowledge of pharmaceutical product development.

**<u>Defendant Arbel</u>**

58. Defendant Arbel co-founded the Company and has served as a Company director since May 2004. She also serves as the Vice-Chairperson of the Board, as the Chair of the Governance, Nominating and Compensation Committee, and as a member of the Audit Committee.

59. The 2025 Proxy Statement stated the following about Defendant Arbel:

> Dr. Irit Arbel, one of the Company's co-founders, joined the Company in May 2004 as a director and served as President of the Company for six (6) months. Currently, Dr. Arbel is the Vice-Chairperson of the Board and the Chair of the Governance, Nominating and Compensation Committee (the "GNC Committee"). She previously served as Chief Executive Officer of Neurochords Corp ("Neurochords"), a biotechnology firm developing graphene-based scaffolds for nerve reconstruction in the acute spinal cord and peripheral nerve injury, from August 2018 to 2020. Prior to Neurochords, Dr. Arbel served as Executive Vice President, Research and Development at Savicell Diagnostic Ltd from July 2012 until August 2018. From 2009 through 2011, Dr. Arbel served as Chairperson of Real Aesthetics Ltd., a company specializing in cellulite ultrasound treatment, and BRH Medical, a developer of medical devices for wound healing. She was also Director of M&A at RFB Investment House, a private investment firm focusing on early stage technology related companies. Previously, Dr. Arbel was President and Chief Executive Officer of Pluristem Life Systems, Inc., a biotechnology company, and prior to that, Israeli Sales Manager of Merck, Sharp & Dohme, a pharmaceutical company. Dr. Arbel earned her Post Doctorate degree in 1997 in Neurobiology, after performing research in the area of Multiple Sclerosis. Dr. Arbel also holds a Chemical Engineering degree from the Technion, Israel's Institute of Technology. We believe Dr. Arbel possesses specific attributes that qualify her to serve on our Board, including Dr. Arbel's extensive experience in the biotechnology field and significant leadership skills as a chief executive officer. Dr. Arbel previously served as our President and the Chairperson of the Board.

**Defendant Bairu**

60. Defendant Bairu has served as a Company director since October 2021. He has also served as a member of the Audit Committee since December 18, 2023.

61. According to the 2025 Proxy Statement, pursuant to an October 28, 2021 resolution of the Board, Defendant Bairu receives an annual cash award in the amount of $30,000, paid in biannual installments, from the Company as compensation for his service on the Board.

62. The 2025 Proxy Statement stated the following about Defendant Bairu:

> Dr. Menghisteab Bairu joined the Company in October 2021 as a director. Currently, Dr. Bairu serves as co-founder, President and Chief Executive Officer of Bio Usawa, Inc., a private company that develops and manufactures quality, affordable monoclonal antibodies. In addition to his role at Bio Usawa, Dr. Bairu serves as the founder, chairman and Chief Executive Officer of Proxenia Venture Partners, which focuses on companies in late preclinical and early-stage clinical development in biotechnology. Dr. Bairu has also served as Chairman and Chief Executive Officer of Bairex, an international medical education and market research organization focused on Africa and the Middle East since December 2018. Dr. Bairu also served as Executive Chairman of Treos Bio Limited from 2016 to 2019, a start-up company that uses computational biology to develop precision cancer immunotherapies tailored to patients' genetics. In addition, he is Founder and Chairman Emeritus of Serenus Biotherapeutics, Inc., an emerging market focused specialty biopharmaceutical company, and has served on its board since 2013. Dr. Bairu received his M.D. from Università degli Studi di Milano and currently serves as Adjunct Professor at the University of California, San Francisco School of Medicine, where he lectures on global clinical trials' design, development, and conduct. We believe that Dr. Bairu possesses specific attributes that qualify him to serve on our Board including his valuable leadership skills and his deep knowledge of pharmaceutical product development.

**Defendant Frenkel**

63. Defendant Frenkel served as a Company director and Chairperson from March 2020 until July 24, 2026.

64. For the 2020 Fiscal Year, Defendant Frenkel received $200,353 from the Company, which consisted entirely of option awards. For the 2021 Fiscal Year, Defendant Frenkel received $153,167 in total compensation from the Company, which consisted entirely of option

awards. For the 2022 Fiscal Year, Defendant Frenkel received $152,811 in total compensation from the Company, which consisted entirely of options awards.

65. The 2025 Proxy Statement stated the following about Defendant Frenkel:

> Prof. Jacob Frenkel joined the Company in March 2020 as a director and Chairperson. Prof. Frenkel is Chairman Emeritus of the Board of Trustees of the Group of Thirty ("G-30"), which is a private, nonprofit, Consultative Group on International Economic and Monetary Affairs. Prof. Frenkel served as Chairman of JPMorgan Chase International from 2009 to 2020. Previously, from 2009 to 2019, Prof. Frenkel served as a member of the board of directors of Boston Properties LP and Loews Corporation. From 2001 to 2011, he served as Chairman and Chief Executive Officer of the G-30, and from 2012 to 2022 as Chairman of the Board of Trustees of the G-30. From 2004 to 2009, he served as Vice Chairman of American International Group, Inc. and from 2000 to 2004 as Chairman of Merrill Lynch International. Between 1991 and 2000 he served two terms as the Governor of the Bank of Israel. Prof. Frenkel is Chairman Emeritus of the Board of Governors of Tel Aviv University, where he is also Chairman of the Frenkel-Zuckerman Institute for Global Economics. He holds a B.A. in economics and political science from the Hebrew University of Jerusalem, and an M.A. and Ph.D. in economics from the University of Chicago. We believe Prof. Frenkel possesses specific attributes that qualify him to serve on our Board, including his valuable leadership skills and his deep knowledge of the financial industry.

**Defendant Polverino**

66. Defendant Polverino has served as Company director since February 2018. He also serves as a member of the Governance, Nominating and Compensation Committee.

67. For the 2020 Fiscal Year, Defendant Polverino received $12,499 in total compensation from the Company. This consisted entirely of stock awards. For the 2021 Fiscal Year, Defendant Polverino received $33,905 in total compensation from the Company. This included $12,500 in fees earned or paid in cash, and $21,405 in stock awards. For the 2022 Fiscal Year, Defendant Polverino received $24,612 in total compensation from the Company. This included $12,500 in fees earned or paid in cash and $12,112 in stock awards.

68. The 2025 Proxy Statement said the following about Defendant Polverino:

> Dr. Anthony Polverino joined the Company on February 5, 2018 as a director. Dr. Polverino is currently an independent consultant to corporate executives and board

members. Dr. Polverino was an Executive Vice President Early Development and Chief Scientific Officer of Zymeworks Inc. ("Zymeworks") from September of 2018 to January 2022, and where he was responsible for establishing the vision, strategy, and general management of the organization and overseeing the advancement of products from discovery research through translational research/early development to create a seamless link to clinical development. Prior to Zymeworks, Dr. Polverino was the interim Chief Scientific Officer of Kite Pharma, Inc. ("Kite") (now a wholly-owned subsidiary of Gilead Sciences), which he joined in 2015, and where he was responsible for establishing Kite's strategic non-clinical R&D roadmap to support its current and future portfolio. Prior to this, he was the Vice President of research at Kite, where his responsibilities included corporate goal setting, budget allocation, scientific and investor interactions, business development in-licensing and partnership deals. Dr. Polverino spent twenty (20) years in positions of increasing responsibilities at Amgen, Inc. ("Amgen"), most recently as executive director of its Therapeutic Innovation Unit, where he managed research programs in oncology, metabolic disease, inflammatory disease and schizophrenia. Prior to Amgen, he was a postdoctoral scientist at Cold Spring Harbor Laboratory, where he worked primarily on oncology research. He earned a B.Sc. in Biochemistry/Physiology and a B.Sc. (Honors) in Pharmacology, both from Adelaide University in Adelaide, Australia and a Ph.D. in Biochemistry from Flinders University, also in Adelaide. We believe that Dr. Polverino possesses specific attributes that qualify him to serve on our Board, including his deep knowledge of the pharmaceutical industry.

**Defendant Taub**

69. Defendant Taub served as a Company director from March 2009 until he resigned on June 15, 2023. Prior to his resignation, Defendant Taub served as Chairman of the Audit Committee.

70. For the 2021 Fiscal Year, Defendant Taub received $81,360 in total compensation from the Company. This consisted entirely of stock awards.

71. The 2022 Proxy Statement said the following about Defendant Taub:

Malcolm Taub joined the Company in March 2009 as a director. Mr. Taub currently serves as the Managing Partner of Taub & Lewis LLP, a full-service law firm in New York. From October 2010 to December 2019, Mr. Taub has been a Partner at Davidoff Malito & Hutcher LLP, a full-service law and government relations firm. From 2001 to September 30, 2010, Mr. Taub was the Managing Member of Malcolm S. Taub LLP, a law firm which practiced in the areas of commercial litigation, among other practice areas. Mr. Taub also works on art transactions, in the capacity as an attorney and a consultant. Mr. Taub has also served as a principal of a firm which provides consulting services to private

> companies going public in the United States. Mr. Taub has acted as a consultant to the New York Stock Exchange in its Market Surveillance Department. Mr. Taub acts as a Trustee of The Gateway Schools of New York and The Devereux Glenholme School in Washington, Connecticut. Mr. Taub has served as an adjunct professor at Long Island University, Manhattan Marymount College and New York University Real Estate Institute. Mr. Taub holds a B.A. from Brooklyn College and a J.D. from Brooklyn Law School. Mr. Taub formerly served on the Board of Directors of Safer Shot, Inc. (formerly known as Monumental Marketing Inc.). We believe that Mr. Taub possesses specific attributes that qualify him to serve on our Board including Mr. Taub's vast law experience and his demonstrated leadership skills as a managing member of a law firm.

**Defendant Yablonka**

72. Defendant Yablonka has served as a Company director since June 2014 and as the Company's Executive Vice President, Chief Business Officer since March 6, 2017. He also previously served as the Company's Chief Operating Officer from June 2014 until March 6, 2017.

73. For the 2021 Fiscal Year, Defendant Yablonka received $77,900 in total compensation from the Company, which consisted entirely of option awards.

74. The 2025 Proxy Statement stated the following about Defendant Yablonka:

> Mr. Uri Yablonka joined the Company in June 2014 as Chief Operating Officer and as a member of the Board. In March 2017 he was appointed Executive Vice President, Chief Business Officer and ceased to serve as the Company's Chief Operating Officer. Prior to joining the Company, beginning in 2010, Mr. Yablonka served as owner and General Manager of Uri Yablonka Ltd., a business consulting firm. From January 2011 to May 2014, he served as Vice President, Business Development at ACC International Holdings Ltd. ("ACC International"), an affiliate of ACCBT Corp. Prior to his role in ACC International, Mr. Yablonka served as Senior Partner of PM-PR Media Consulting Ltd. from 2008 to January 2011, where he led public relations and strategy consulting for a wide range of governmental and private organizations. From 2002 to 2008, he served as a correspondent at the Maariv Daily News Paper, including extensive service as a Diplomatic Correspondent. Mr. Yablonka holds an LL.B from Ono Academic College and an LL.M from Bar-Ilan University, and is a member of the Israeli Bar Association. We believe that Mr. Yablonka's skills and experience provide the variety and depth of knowledge, judgment and vision necessary for the effective oversight of the Company. His experience in business consulting and development and media experience are expected to be valuable to the Company in its current stage of growth and beyond, and his governmental experience can provide valuable insight into issues faced by companies in regulated industries such as ours. We believe that these

skills and experiences qualify Mr. Yablonka to serve as a director and secretary of the Company.

**Defendant Kern**

75. Defendant Kern has served on the Company's Scientific Advisory Board since January 20, 2023. Prior to this, he served as the Company's President and CMO from March 2017 until his retirement from both positions on January 3, 2024. The proxy statement the Company filed on Schedule 14A on May 16, 2023 states that the Scientific Advisory Board "advises the management team on scientific matters such as research, clinical trials and drug development."

76. For the 2020 Fiscal Year, Defendant Kern received $1,528,281 in total compensation from the Company. This included $500,000 in salary, $290,000 in bonus, $410,621 in option awards, $273,444 in stock awards, and $54,216 in all other compensation. For the 2021 Fiscal Year, Defendant Kern received $938,833 in total compensation. This included $500,000 in salary, $250,000 in bonus, $125,971 in stock awards, and $62,862 in all other compensation. For the 2022 Fiscal Year, Defendant Kern received $812,559 in total compensation from the Company. This included $500,000 in salary, $150,000 in bonus, $106,220 in stock awards, and $56,339 in all other compensation.

77. The Company's website[6] states the following about Defendant Kern:

> Ralph Kern, MD, MHSc, was the President and Chief Medical Officer at BrainStorm from March 2017-January 2023. He brought significant industry and neurodegenerative disease experience to the organization. His biotech experience includes senior medical roles at Genzyme, Novartis, and Biogen. At Novartis he was Vice President and Head of the Neuroscience Medical Team, leading the global launch of Gilenya® in relapsing remitting multiple sclerosis (rrMS). At Biogen he was Senior Vice President and Head of the Worldwide Medical Organization. His team launched Zinbryta® in rrMS and Spinraza® in spinal muscular atrophy (SMA), and developed the medical and scientific strategy for MS, SMA, and Alzheimer's disease.

[6] https://brainstorm-cell.com/directors/ralph-kern-md-mhsc/

> Dr. Kern completed his neurology training at McGill University, practiced neuromuscular neurology at Mount Sinai Hospital in Toronto, and was head of the Postgraduate Academic Neurology Program at the University of Toronto. He completed further postgraduate training in Health Administration at the Institute for Health Policy Management and Evaluation at the University of Toronto. Dr. Kern received his MD degree from Queen's University, is board-certified in neurology and neuromuscular disease, and is a member of the Royal College of Physicians and Surgeons of Canada.

**Defendant Naor**

78. Defendant has served as a Company director since June 2023. He also serves as Chair of the Audit Committee and as a member of the Governance, Nominating and Compensation Committee.

79. The 2025 Proxy Statement stated the following about Defendant Naor:

> Mr. Nir Naor joined the Company in June 2023 as a director and as Chair of the Audit Committee. Mr. Naor has been serving in a finance advisory capacity to a number of private companies. Mr. Naor serves as Chief Financial Officer of Axogen since December 2023. From October 2022 to November 2023, Mr. Naor held advisory and short-term CFO roles at a number of growth companies. Mr. Naor previously served as the Chief Financial Officer of HMNC Brain Health from December 2021 to October 2022 and as the Chief Financial Officer of Arbor Pharmaceuticals from January 2021 to September 2021. Prior to this, Mr. Naor served as the Chief Financial Officer, U.S. and the Americas, of Molnlycke, from October 2017 to January 2021. Prior to this, Mr. Naor served as Chief Financial Officer, U.S., of UCB from July 2016 to July 2017. Previously, Mr. Naor held various senior leadership finance roles in the biopharmaceutical industry. Previously, Mr. Naor worked as an investment banker and as a commercial lawyer in Israel. Mr. Naor is a Certified Public Accountant (Israel, inactive) and a Chartered Financial Analyst, and holds an MBA from IMD Business School in Switzerland and an MBA from Tel Aviv University in Israel, an L.L.M. from Hamburg University in Germany, and an L.L.B. in Law and a Bachelor degree in Accounting from Tel Aviv University in Israel. We believe that Mr. Naor possesses specific attributes that qualify him to serve on our Board, including his substantial experience in corporate finance and the biopharmaceutical industry.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

80. By reason of their positions as officers, directors, and/or fiduciaries of Brainstorm Cell and because of their ability to control the business and corporate affairs of Brainstorm Cell, the Individual Defendants owed Brainstorm Cell and its shareholders fiduciary obligations of trust,

loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Brainstorm Cell in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Brainstorm Cell and its shareholders so as to benefit all shareholders equally.

81. Each director and officer of the Company owes to Brainstorm Cell and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

82. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Brainstorm Cell, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

83. To discharge their duties, the officers and directors of Brainstorm Cell were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

84. Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Brainstorm Cell, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the officers and directors of the Company

has been ratified by the remaining Individual Defendants who collectively comprised a majority of Brainstorm Cell's Board at all relevant times.

85. As the senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Amended Consolidated Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

86. To discharge their duties, the officers and directors of Brainstorm Cell were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Brainstorm Cell were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New York, and the United States, and pursuant to Brainstorm Cell's own Code of Business Conduct and Ethics (the "Code of Ethics");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Brainstorm Cell conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Brainstorm Cell and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Brainstorm Cell's operations would comply with all applicable laws and Brainstorm Cell's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

87. Each of the Individual Defendants further owed to Brainstorm Cell and the shareholders the duty of loyalty requiring that each favor Brainstorm Cell's interest and that of its

shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

88. At all times relevant hereto, the Individual Defendants were the agents of each other and of Brainstorm Cell and were at all times acting within the course and scope of such agency.

89. Because of their advisory, executive, managerial, directorial, and controlling positions with Brainstorm Cell, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

90. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Brainstorm Cell.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

91. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

92. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act ; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

93. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Brainstorm Cell was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

94. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

95. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Brainstorm Cell and was at all times acting within the course and scope of such agency.

## CODE OF ETHICS

96. The Company's Code of Ethics represents that it "sets forth legal and ethical standards of conduct for employees, officers and directors of Brainstorm Cell Therapeutics Inc. and its subsidiaries (the 'Company'), including the Company's principal executive officer and its senior financial officers[.]"

97. The Code of Ethics provides, as to "Compliance with Laws, Rules and Regulations," that:

> The Company requires that all employees, officers and directors comply with all laws, rules and regulations applicable to the Company wherever it does business. You are expected to use good judgment and common sense in seeking to comply with all applicable laws, rules and regulations and to ask for advice when you are uncertain about them.
>
> If you become aware of the violation of any law, rule or regulation by the Company, whether by its employees, officers or directors, it is your responsibility to promptly report the matter to your supervisor or Legal Counsel. While it is the Company's desire to address matters internally, nothing in this Code should discourage you from reporting any illegal activity, including any violation of the securities laws, antitrust laws, environmental laws or any other federal, state or foreign law, rule or regulation, to the appropriate regulatory authority. Employees, officers and directors shall not discharge, demote, suspend, threaten, harass or in any other manner discriminate against an employee because he or she in good faith reports any such violation. This Code should not be construed to prohibit you from testifying, participating or otherwise assisting in any state or federal administrative, judicial or legislative proceeding or investigation.

98. The Code of Ethics provides, as to "Conflicts of Interest," the following, in relevant part:

> Employees, officers and directors must act in the best interests of the Company. You must refrain from engaging in any activity or having a personal interest that presents a "conflict of interest." A conflict of interest occurs when your personal interest interferes with the interests of the Company. A conflict of interest can arise whenever you, as an employee, officer or director, take action or have an interest that prevents you from performing your Company duties and responsibilities honestly, objectively and effectively.

99. The Code of Ethics provides, as to "Honest and Ethical Conduct and Fair Dealing," that:

> Keeping the best interests of the Company in mind, employees, officers and directors should endeavor to deal honestly, ethically and fairly with the Company's suppliers, customers, competitors and employees. Statements regarding the Company's products and services must not be untrue, misleading, deceptive or fraudulent. You must not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice.

100. The Code of Ethics provides, as to "Protection and Proper Use of Corporate Assets," that:

> Employees, officers and directors should seek to protect the Company's assets. Theft, carelessness and waste have a direct impact on the Company's financial performance. Employees, officers and directors must use the Company's assets and services solely for legitimate business purposes of the Company and not for any personal benefit or the personal benefit of anyone else.
>
> Employees, officers and directors must advance the Company's legitimate interests when the opportunity to do so arises. You must not take for yourself opportunities that are discovered through your position with the Company or the use of property or information of the Company.

101. The Code of Ethics provides, as to "Accuracy of Books and Public Reports," that:

> Employees, officers and directors must honestly and accurately report all business transactions. You are responsible for the accuracy of your records and reports. Accurate information is essential to the Company's ability to meet legal and regulatory obligations.
>
> All Company books, records and accounts shall be maintained in accordance with all applicable regulations and standards and accurately reflect the true nature of the transactions they record. The financial statements of the Company shall conform to generally accepted accounting principles and the Company's accounting policies. No undisclosed or unrecorded account or fund shall be established for any purpose. No false or misleading entries shall be made in the Company's books or records for any reason, and no disbursement of corporate funds or other corporate property shall be made without adequate supporting documentation (other than de minimis amounts).
>
> It is the policy of the Company to provide full, fair, accurate, timely and understandable disclosure in reports and documents filed with, or submitted to, the Securities and Exchange Commission and in other public communications.

102. The Code of Ethics provides, as to "Concerns Regarding Accounting or Auditing Matters," that:

> Employees with concerns regarding questionable accounting or auditing matters or complaints regarding accounting, internal accounting controls or auditing matters may confidentially, and anonymously if they wish, submit such concerns or complaints in writing to Legal Counsel. See "Reporting and Compliance Procedures." All such concerns and complaints of a material nature will be forwarded to the Audit Committee of the Board of Directors. In any event, a

> complete record of all complaints will be provided to the Audit Committee each fiscal quarter. Any such concerns or complaints may also be communicated confidentially and, if you desire, anonymously, directly to any member of the Audit Committee of the Board of Directors.
>
> The Audit Committee will evaluate the merits of any concerns or complaints received by it and authorize such follow-up actions, if any, as it deems necessary or appropriate to address the substance of the concern or complaint.
>
> The Company will not discipline, discriminate against or retaliate against any employee who reports a complaint or concern (unless the employee is found to have knowingly and willfully made a false report).

103. Regarding "Waivers of this Code of Business Conduct and Ethics," the Code of Ethics states the following:

> While some of the policies contained in this Code must be strictly adhered to and no exceptions can be allowed, in other cases exceptions may be possible. Any employee or officer who believes that an exception to any of these policies is appropriate in his or her case should first contact his or her immediate supervisor. If the supervisor agrees that an exception is appropriate, the approval of Legal Counsel must be obtained. Legal Counsel shall be responsible for maintaining a complete record of all requests for exceptions to any of these policies and the disposition of such requests.
>
> Any executive officer, senior financial officer or director who seeks an exception to any of these policies should contact Legal Counsel. Any waiver of this Code for executive officers, senior financial officers or directors or any change to this Code that applies to executive officers, senior financial officers or directors may be made only by the Board of Directors of the Company and will be disclosed as required by law or stock market regulation.

104. The Code of Ethics provides, as to "Reporting and Compliance Procedures," the following, in relevant part:

> Every employee, officer and director has the responsibility to ask questions, seek guidance, report suspected violations and express concerns regarding compliance with this Code. Any employee, officer or director who knows or believes that any other employee or representative of the Company has engaged or is engaging in Company-related conduct that violates applicable law or this Code should report such information to his or her supervisor or to Legal Counsel, as described below. You may report such conduct openly or anonymously without fear of retaliation. The Company will not discipline, discriminate against or retaliate against any employee who reports such conduct in good faith, whether or not such information

> is ultimately proven to be correct, or who cooperates in any investigation or inquiry regarding such conduct. Any supervisor who receives a report of a violation of this Code must immediately inform Legal Counsel.
>
> You may report violations of this Code, on a confidential or anonymous basis, by contacting Legal Counsel by fax (617-399-6930), mail (Tom Rosedale, BRL Law Group LLC, 31 St. James Ave., Suite 850, Boston, MA 02116) or e-mail (trosedale@brllawgroup.com). While we prefer that you identify yourself when reporting violations so that we may follow up with you, as necessary, for additional information, you may remain anonymous if you wish.

105. In violation of the Code of Ethics, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's internal controls over public reporting of the Individual Defendants' scheme to issue materially false and misleading statements to the public and their scheme to facilitate and disguise the Individual Defendants' violations of law, including, but not limited to, breaches of fiduciary duty, gross mismanagement, and unjust enrichment. In violation of the Code of Ethics, the Individual Defendants consciously disregarded their duties to comply with the applicable laws and regulations, engage in fair dealing, avoid using corporate opportunities for personal gain, avoid conflicts of interest, appropriately maintain the Company's books, records, accounts, and financial statements, and make accurate filings with the SEC.

**<u>BRAINSTORM CELL'S AUDIT COMMITTEE CHARTER</u>**

106. The Company also maintains an Audit Committee Charter. The purpose of the Audit Committee is "to assist the Board of Directors' oversight of the Company's accounting and financial reporting processes and the audits of the Company's financial statements." Regarding "Audited Financial Statements," the Audit Committee Charter states the following:

> 6. Review and Discussion. The Audit Committee shall review and discuss with the Company's management and independent auditor the Company's audited financial statements, including the matters about which Statement on Auditing Standards No. 61 (Codification of Statements on Auditing Standards, AU §380) requires discussion.

> 7. Recommendation to Board Regarding Financial Statements. The Audit Committee shall consider whether it will recommend to the Board of Directors that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K.
>
> 8. Audit Committee Report. The Audit Committee shall prepare an annual committee report for inclusion where necessary in the proxy statement of the Company relating to its annual meeting of security holders.

107. Regarding "Controls and Procedures," the Audit Committee Charter stated the following:

> 10. Oversight. The Audit Committee shall coordinate the Board of Directors' oversight of the Company's internal control over financial reporting, disclosure controls and procedures and code of conduct. The Audit Committee shall receive and review the reports of the CEO and CFO required by Rule 13a-14 of the Exchange Act.
>
> 11. Procedures for Complaints. The Audit Committee shall establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters; and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.
>
> 12. Related-Party Transactions. The Audit Committee shall review all related party transactions on an ongoing basis, and all such transactions must be approved by the Audit Committee.
>
> 13. Additional Powers. The Audit Committee shall have such other duties as may be delegated from time to time by the Board of Directors.

108. Under a section titled "General," the Audit Committee Charter states the following:

> The Audit Committee shall discharge its responsibilities, and shall assess the information provided by the Company's management and the independent auditor, in accordance with its business judgment. Management is responsible for the preparation, presentation, and integrity of the Company's financial statements and for the appropriateness of the accounting principles and reporting policies that are used by the Company. The independent auditors are responsible for auditing the Company's financial statements and for reviewing the Company's unaudited interim financial statements. The authority and responsibilities set forth in this Charter do not reflect or create any duty or obligation of the Audit Committee to plan or

> conduct any audit, to determine or certify that the Company's financial statements are complete, accurate, fairly presented, or in accordance with generally accepted accounting principles or applicable law, or to guarantee the independent auditor's report.

109. In violation of the Audit Committee Charter, Defendants Almenoff and Arbel failed to adequately review and discuss the Company's quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

110. Brainstorm Cell is a Delaware corporation based in New York that purportedly develops autologous cellular therapies for the treatment of neurodegenerative diseases, including ALS, Progressive Multiple Sclerosis, Alzheimer's disease, and other neurodegenerative diseases. Brainstorm Cell developed NurOwn, a proprietary cell therapy platform that was purportedly designed for the treatment of ALS.

***NurOwn as a treatment for ALS***

111. ALS is an ultimately fatal and progressive neurodegenerative disease that primarily impacts motor neurons in the cerebral motor cortex, brainstem, and spinal cord, that leads to loss of voluntary movement and difficulty swallowing, speaking, and breathing. There is no known cause for ALS, however a small number of ALS patients have a family history of the disease.

112. All forms of ALS are marked by the degeneration of both upper and lower motor neurons. Most patients die within three to five years of onset, and only 10% of ALS patients survive more than 10 years.

113. There are a few approved treatments for ALS, and none reverse the damage to motor neurons that is caused by the disease. Even in the case of an approved treatment, the benefits of the approved treatments are modest. The FDA approved the first drug to treat ALS in 1995. This drug, called Riluzle, prolonged survival in some patients by 2-3 months during clinical trials. The FDA approved Edaravone, another ALS treatment, in 2017. Edaravone was shown to slow the functional decline in some ALS patients. In September 2022, the FDA approved Relyvrio, which is a drug manufactured by Amylyx. Relyvrio was also shown to slow functional decline.

114. Brainstorm Cell's lead product candidate is called Debamstrocel ("NurOwn" or "MSC-NTF"). NurOwn is a cellular therapy that is composed of mesenchymal stromal cells, which are known as mesenchymal stem cells ("MSCs"). MSCs are adult stem cells that are traditionally found within bone marrow. NurOwn comes from the stem cells of the patient themselves, and it is generated from a single bone barrow aspirate. This manufacturing process is intended to increase the levels of neurotrophic factors ("NTFs") that are typically produced by MSC to generate a cellular product. The Company refers to this cellular product as "MSC-NFT" cells. NurOwn is intended to work through MSC-NTF factors that allegedly "modulate neuroinflammatory and neurodegenerative disease processes, promote neuronal survival, and improve neurological function." NurOwn is administered into a patient's cerebrospinal fluid through a standard injection.

***FDA Regulatory Landscape in the United States***

115. In the United States, the FDA is tasked with regulating biologics under the Federal Food, Drug, and Cosmetic Act. Pharmaceutical and Biological products, like NurOwn, need to be approved by the FDA through the BLA process before they can be legally marketed.

116. BLAs require two distinct sets of data that are generated in two distinct stages: pre-clinical and clinical. The pre-clinical development stage typically involves laboratory evaluations of the drug's chemistry, formulation and stability, in addition to studies to evaluate the pharmacological activity and toxicity in animals, which tends to support subsequent clinical testing. The clinical state of development surrounds the administration of the product candidate to healthy volunteers and patients under the supervision of qualified investigators.

117. Clinical trials are typically conducted in three sequential trials, known as Phase I, Phase II, and Phase III. Each of these three trials often overlap. Phase III clinical trials typically involve large numbers of patients at multiple sites in different countries (from several hundred to several thousand subjects). Phase III trials are designed to provide the data that is necessary to demonstrate the efficacy of the product for its intended use, its safety, and establish overall risk/benefit understandings of the product to provide an adequate basis for product approval. The FDA typically requires two adequate and well-controlled Phase III clinical trials in order for a product to obtain approval of a BLA.

118. Following the conclusion of clinical trials, companies seeking FDA approval must submit a BLA with the FDA. The BLA includes both clinical trial data and other information. BLAs are designed to provide documentation that a product candidate demonstrates safety and efficacy.

119. As part of the required safety and efficacy data, the company must provide information regarding the CMC of the product candidate. The CMC is required to include information about the manufacturing process, facilities that are to be used to ensure product quality, and results of analytical testing that was conducted on the chemistry of the product candidate.

120. The critical element of CMC include: (i) how and where the drug is made; (ii) how raw materials are tested and monitored; (iii) what control procedures are in place to ensure product consistency and quality; (iv) whether quality attributes are adequately identified and characterized for the product; (v) whether test methods to test product quality are appropriate; and (vi) how long the product maintains its quality after it is made. CMC is essential to ensure that the drug that will be sold to the public will have quality attributes similar to those of the drug demonstrated to be safe and effective, to assure that the quality of the drug meets appropriate standards and is consistent, and to ensure that the drug is the same drug as the described on the label. Essentially, CMC maintains the connection in quality between the drug used in the clinical trials and the drug that will be marketed to consumers.

121. According to the Public Heath Services Act ("PHS"), a biological product like NurOwn cannot be licensed by the FDA unless the product is "safe, pure, and potent." The FDA's regulations interpret the term "potency" to also include "effectiveness." Therefore, the FDA has "generally considered substantial evidence of effectiveness to be necessary to support licensure of a biological product under section 351 of the PHS Act." The "substantial evidence" of effectiveness standard implicates both the quality and quantity of the evidence provided. With respect to quality, the FDA routinely requires sponsors to demonstrate effectiveness via "adequate and well-controlled" clinical trials. Additionally, "[r]eports of adequate and well-controlled investigations provide the primary basis for determining whether there is 'substantial evidence' to support the claims of effectiveness for new drug[,]" including biological products.

122. The FDA's typical statutory standards for effectiveness apply to drugs and biologics used to treat ALS as they do to all other drugs and biologics. The FDA has made clear that is appropriate to exercise regulatory flexibility "in applying the statutory standards to

treatments for serious diseases with unmet medical needs (like ALS), ***while preserving appropriate assurance of safety and effectiveness***." The conclusion that a study has demonstrated an effect of a drug or biologic is critical to meet the legal standard for substantial evidence of effectiveness. Additionally, in order to establish a drug's effectiveness, it is essential to distinguish between the effects of the drug from "other influences, such as spontaneous change in the course of the disease, placebo effect, or biased observation."

123. Appropriate endpoints must be used by the sponsor of a clinical study to determine if the proposed treatment has an effect. The statistical analysis plan must be determined before the trial begins and the final determination of the efficacy of the product must be made based upon the pre-specified clinical endpoints, as analyzed in the pre-specified statistical analysis plan ("SAP"). Additionally, the method for assessing, measuring, and analyzing the endpoint(s) must be detailed in the study protocol as well as the SAP.

124. The FDA and the applicant must be able to agree prospectively in the study design and the SAP and the applicant should be able to finalize, to the extent possible, the study design and SAP prior to the initiation of the study. Alternatively, a study could follow the design of a SPA. An SPA is a process where the trial sponsor, along with the FDA, discusses the design and size of the clinical study to determine if it adequately addresses the scientific and regulatory requirements that could be used to support marketing approval. An SPA agreement notes the FDA's concurrence with the adequacy and acceptability of the specific elements of the overall trial protocol design.

***The Use of Endpoints in Clinical Trials for ALS Treatment***

125. The FDA has made clear that, with respect to effectiveness endpoints in clinical trials for ALS treatments, the FDA encourages the development of new ways to measure the

clinical effectiveness of treatments in clinical trial patients. Effectiveness should generally be demonstrated by some showing of the treatment's effect on the function of clinical trial patients in daily activities. The use of a scale such as ALSFRS-S, or some other similar scale to measure patient function is encouraged. The ALSFRS-R, or the revised Amyotrophic Lateral Sclerosis Functional Rating Scale, became the most widely applied rating scale in ALS clinical trials as a primary or secondary outcome measure in the late 1990s.

126. The ALSFRS-R is a widely accepted primary endpoint measure for Phase 3 ALS clinical trials to monitor functional decline in patients over a period of time, with survival often used as a secondary endpoint.

127. The ALSFRS-R looks at twelve separate components and assesses the patient's current motor functioning level across four areas: bulbar, fine motor, gross motor, and respiratory. Each item on the ALSFRS-R has five options for ordinal response levels ranging from 0 (complete loss of function) to 4 (normal function), with total scores ranging from 0 to 48. The highest total scores indicate higher levels of functioning.

128. Other efficacy measures in ALS clinical trials include Slow Vital Capacity ("SVC") and Combined Assessment function and Survival ("CAFS"). SVC measures the highest amount of air an individual can exhale in a single breath. CAFS is a composite endpoint that observes a combination of functional status with overall survival. The FDA has stated that functional endpoints can be confused by a loss of data as a result of patient death, so the FDA recommends that sponsors use an analysis method that combines function and survival into a single measurement.

129. Sponsors of ALS clinical trials are also encouraged to characterize an effect on mortality because it is an important consideration in determining the overall safety and effectiveness of a product.

130. More recent ALS clinical trials also have implemented a measurement of biological markers, or biomarkers. Biomarkers are genes, proteins, or other substances found in blood, cerebrospinal fluid ("CSF"), or in other body fluids or tissues, that are capable of being measured. Much research has demonstrated that a few biomarkers have been confirmed to identify people who are the most at risk for developing ALS, tracking the progression of ALS, and also measuring the effectiveness of ALS treatments. The biomarker NfL (Neurofilament Light Chain) is a commonly studied biomarker in ALS research. Neurofilaments are proteins that are specific to neurons, and when neurons are damaged or degenerate, neurofilaments are released into the blood stream and cerebrospinal fluids. NfLs are the most commonly studied neurofilament, as NfL levels are significantly elevated in people with ALS. However, NfL is a "nonspecific" biomarker, as elevated levels of NfL are also present in people with other neurodegenerative diseases, such as dementia and multiple sclerosis.

131. A reduction in NfL is typically associated with a reduction in clinical decline in ALS patients. Therefore, a reduction in NfL accompanied with an increase in functional decline in a patient means that the NfL measure does not correlate with efficacy.

***The Process for Submitting a BLA to the FDA***

132. The FDA expects submitted BLAs to be complete in order to produce a meaningful review of the application. Upon receipt of a BLA, the FDA first ensures that the BLA contains all the information that is necessary, and within 60 days, the FDA will either file the BLA or inform the applicant of the FDA's RTF. If the FDA files the BLA, this indicates to the applicant that the

FDA has made some threshold determination that the application is sufficiently complete to permit a substantive review. Alternatively, an RTF allows an applicant to begin repairing deficiencies in the BLA.

133. Even if the FDA issues an RTF, the applicant can choose to "File Over Protest." In the event of a File Over Protest, the FDA can review the BLA and it may also convene an Advisor Committee for an additional discussion.

134. During the course of a candidate product's development, the FDA typically holds three types of meetings with the sponsor. The first of those meetings, the Type A meeting, is intended to advance a stalled product development program, and takes place within 30 days of the FDA receiving a request to meet from the applicant. Type B meetings take place within 60 days of a written meeting request and are conducted at specific points in product development. These points often include obtain FDA input prior to the submission of an investigational new drug application, certain end of Phase 1 trial meetings, end of Phase 2 and pre-Phase 3 meetings, and prior to submission of a BLA. Type C meetings pertain to all other formal meetings regarding the development and review of an investigational product and are scheduled within 75 days of a written request.

***Important Aspects of Clinical Trials***

135. Statistical tests are often predefined prior to the start of a clinical trial. Post hoc analysis refers to the statistical analyses that are designed and performed after a trial was conducted and after the sponsor saw the trial data.

136. Subgroup analyses refers to any evaluation of a treatment effect for a specific endpoint in subgroups of patient identified by baseline characteristics. Researchers often conduct a subgroup analysis to assess the treatment effects for a specific characteristic. A prespecified

subgroup analysis is an analysis that is planned and documented before any examination of the data, preferably in the study protocol itself. A prespecified subgroup analysis will specify the endpoint, the baseline characteristics, and the statistical method used to test for an interaction. PR specification of subgroup analyses provides reassurance against "data dredging."

137. Contrastingly, a post hoc subgroup analysis is a subgroup analysis that has not been hypothesis tested prior to examining the trial data. Post hoc subgroup analyses carry a high risk of finding false positive results. Therefore, a hypothesis that was generated through post hoc analyses was neither proven by an experiment nor generated from a scientific basis.

138. By running multiple post hoc analyses, a researcher can all but guarantee a statistically significant result. This is called "multiplicity" in statistics and often results in inflated false positives.

***The Company's Development of NurOwn***

139. The clinical development of NurOwn consisted of four separate clinical trials. The first two trials were early phase and conducted outside of the United States. The third trial was a Phase 2 trial that was randomized, double blind, and placebo-controlled ("Phase 2 Study") that was conducted under an FDA Investigational New Drug ("IND") application. Safety was the primary endpoint of the Phase 2 Study, while secondary endpoints evaluated efficacy. The Company's Phase 3 Trial was randomized, and a double-blind placebo-controlled study.

140. The Company first began interacting with the FDA on December 20, 2013 when Brainstorm Cell first submitted its IND to the FDA. In October of 2014, the FDA granted "Fast Track" recognition to NurOwn, which is designed to facilitate the development and expedite FDA review of drugs that are developed to treat serious conditions and fill an unmet medical need.

141. As previously discussed, the primary endpoint of Brainstorm Cell's Phase 2 Study was safety, with its secondary endpoint being efficacy. The Phase 2 Study also implemented an exploratory subgroup analyses of "rapid progressors," defined as patients with a decrease of two or more points on the ALSFRS-R scale from screening to baseline, and "slow progressors," defined as patients with a decrease of less than two points in ALSFRS-R from screening to baseline. Brainstorm Cell reported that this subgroup analyses demonstrated that patients in the Phase 2 Study who were rapid progressors benefitted from NurOwn.

142. The Company held a Type B End-of-Phase 2 Meeting with the FDA to discuss the Phase 2 Study on November 21, 2016. This meeting also involved initial discussions with the FDA regarding plans for a Phase 3 clinical trial. For the Phase 3 Trial, the Company proposed a primary efficacy endpoint of the proportion of patient whose disease was stabilized or improved, as ensured by a 1.5 point, or more, improvement in post-treatment slope versus pre-treatment slope in ALSFRS-R score at 24 weeks from the first treatment.

143. The FDA did not agree with the Company's choice of a proposed primary efficacy endpoint. At the meeting, the FDA specifically told the Company that it "strongly recommended that [it] consider a primary efficacy endpoint whose clinical meaningfulness is easier to interpret."

144. Brainstorm Cell held a Type C meeting with the FDA on August 7, 2017, to discuss the protocol for the Phase 3 Trial. At this meeting, the FDA shared concerns with Brainstorm Cell, relating to the meaningfulness of defining a "responder" as a patient showing improvement in the slow of ALSFRS-R over time, compared with the slope prior to initiating treatment. The FDA "strongly recommended" to Brainstorm Cell that it instead use either survival or CAFS as the primary efficacy endpoint for the Phase 3 Trial. The FDA also recommended to the Company that

the Company obtain an SPA for the Phase 3 Trial, which would ensure that the FDA agreed with Brainstorm Cell's clinical trial design and protocol.

145. The Company completed patient enrollment for the Phase 3 Trial in October 2019. The Phase 3 Trial contained 196 patients at various centers in the United States. These patients either received three intrathecal injections of NurOwn eight weeks apart, or placebo. The Phase 3 Trial was randomized, double-blind, and placebo controlled. Contrary to the recommendations of the FDA, the Phase 3 Trial evaluated the efficacy of NurOwn compared with the placebo, measured by the proportion of patients with the previously identified change in slope on the ALSFRS-R scale. The Phase 3 Trial also studied the safety of NurOwn compared to the placebo, and also measured biomarkers in CSF.

146. The Company also chose to enroll only "rapid progressors" in the Phase 3 Trial, "despite the FDA's consistent concern about the definition of 'rapid progressors.' And the exploratory nature of the subgroup findings." The patients in the Phase 3 Trial experienced lower ALSFRS-R score at a baseline than the patients in the Phase 2 Trial.

147. The Company's decision to enroll only "rapid progressors" also went against the FDA's ALS Guidance, which states, in relevant part:

> ***There is a need to understand the safety and effectiveness of investigational drugs for ALS across disease stages.*** Although sponsors may have good reasons to use prognostic enrichment to increase the likelihood of demonstrating a drug effect (e.g., to enroll patients who are more likely to experience rapid progression) or to use predictive enrichment to direct therapy to patients with a particular disease characteristic (e.g., a specific genotype or phenotype), ***sponsors should not unnecessarily exclude patients from a trial enrollment based on characteristics such as age or disease stage unless scientifically justified.***

148. The FDA's statements explicitly informed the Individual Defendants that, in the event of the Phase 3 Trial, exclusion of patients based on the "rapid progressors" criteria was not "scientifically justified."

149. The Company held a Type C meeting with the FDA on November 18, 2019. Defendants Lebovits and Kern attended the meeting, where FDA officials from the FDA's Center for Drug Evaluation and Research (CDER) stated that the Phase 2 study failed to show a statistically significant benefit from the treatment of NurOwn, compared to those patients who received the placebo. FDA officials also stated that while the Company's subgroup analysis suggested a benefit to rapid progressors, the analysis also suggested a harm to "slow progressors." The FDA stated that inconsistent effects are most likely false.

150. During the November 18, 2019 meeting, the FDA informed the Individual Defendants that:

> [The FDA] interpret[s] your Phase 2 data as evidence that your product is not effective for the treatment of ALS. Your proposal that your Phase 2 data suggested benefit for the 'rapid progressors' is most likely over-interpretation of your subgroup analyses. In subgroup analyses, the result for the 'slow progressors' could be interpreted to suggest that your product is harmful to some patients with ALS. ***However, such subgroup results, for both the 'rapid progressors' and that 'slow progressors,' are most likely spurious and misleading, as is often the case for such subgroup analyses.*** We note that it is not clear why a product that you propose to have neuroprotective and immunomodulatory effects would be beneficial for some patients with ALS and harmful to other patients with ALS. Due to their inconsistency (i.e., opposite effects in 'rapid progressors' versus 'slow progressors'), and the unclear biological plausibility for such inconsistency, ***your subgroup results do not support that your product has any other meaningful activity in the treatment of ALS***.

151. In the Meeting Summary of the November 18, 2019 meeting, which the Individual Defendants received several days after the meeting took place, the FDA stated, "***[d]espite FDA's consistent concern about the definition of 'rapid progressors' and the exploratory nature of subgroup findings, the Applicant decided to enroll only 'rapid progressors' in the Phase 3 study.***"

152. During the November 18, 2019 meeting, the FDA again expressed disagreement with the Phase 3 Trial's primary efficacy endpoint. However, as the Phase 3 Trial had already

begun as of that date, the FDA informed Brainstorm Cell that it could not change the existing primary and secondary endpoints because it was important to maintain the integrity of the ongoing trial. The FDA explained that as the Phase 3 Trial was collecting survival and joint rank data, the Phase 3 Trial results would still be "interpretable." The FDA also again indicated that Brainstorm Cell should submit a SPA request for a future Phase 3 study.

153. On February 5, 2020, Defendants Lebovits Fand Kern, among others, attended an FDA CBER "Informal Dispute Resolution" meeting to discuss "outstanding issues" including "efficacy endpoint, and analysis of [Brainstorm's] ongoing Phase 3 study." Here, the FDA again stated that it disagreed with the Phase 3 Trial's primary efficacy endpoint. The FDA informed the Individual Defendants that it was committed to reviewing the data once the study was completed, in order "to determine ***if there is a regulatory path forward that could potentially lead to approval***." FDA stated that it was willing to review the data prior to formal regulatory submission.

154. Despite the fact that the FDA disagreed with the Phase 3 Trial design, on a February 18, 2020 investor conference with Defendants Lebovits and Kern, Defendants represented that the Phase 3 Trial was "aligned with FDA views." During the call, Lebovits gave a more detailed update on the recent meeting with the FDA, stating "This meeting was very important and was a watershed moment for our ALS development program… Objectives of this meeting were to confirm that there is a clear regulatory path forward for NurOwn and ALS." Lebovits continued, "***We had a wonderful discussion. What was most important to Brainstorm was to confirm the date we are collecting in this Phase 3 trial are aligned with current FDA views when considering a BLA for approval.*** At the meeting, the FDA confirmed that the full results of Phase 3 trial is collecting relevant data critical to the assessment of NurOwn's efficacy. The FDA also commented that this is a well-designed trial." Defendant Lebovits further

represented that Brainstorm Cell could be commercializing NurOwn in 2021, depending on the results of the Phase 3 Trial, stating "***that's why we're so excited that the FDA is having these early conversations about the endpoint, and what they want to gather in the data.***"

155. Defendant Kern discussed the meeting further, stating, "The most important outcome of the discussion, of course, was that they confirmed we're completing a well-run study, It is a very high quality study, and the data that will be collected at the end of this study is relevant and critical to the assessment of NurOwn's efficacy. ***It's an important confirmation for us… We obviously were very reassured by their position***."

156. Analyst John Kolbert asked Defendant Kern about the FDA's position on the Phase 3 Trial endpoint ("if there was any one single endpoint, or if you were to focus on your FDA discussions…"). Defendant Kern pointed to the FDA's recent ALS guidance document. Defendant Kern discussed that the recent guidance document was "one of the reasons why we needed to have a realignment" and the ALSFRS-R "really forms the foundation for that." While discussing the ALSFRS-R, Defendant Kern carefully chose to omit the fact that the FDA explicitly told the Company that it disagreed with a slope-based analysis of the ALSFRS in the Phase 3 Trial, but that Brainstorm Cell refused to listen to the FDA.

157. On November 17, 2020, Brainstorm Cell issued a press release announcing top-line results from Phase 3 Trial after the market opened. This press release stated that the Phase 3 Trial did not meet statistical significance in its primary efficacy endpoint, although it purportedly showed "numerical improvements" in the treated group compared to placebo across primary and secondary efficacy endpoints.

158. Following this news, the Company's stock price fell $7.88 per share, from $11.90 to $4.02 per share, amounting to a 66% decline.

159. Despite failing to reach its primary endpoint, Brainstorm Cell represented that NurOwn demonstrated a "clinically meaningful treatment response" across the primary and key secondary endpoints "***in an important pre-specified subgroup*** with early disease based on ALSFRS-R baseline score [of greater than or equal to] 35." Brainstorm Cell also explained in the press release that "Cerebrospinal fluid (CSF) biomarker analyses confirmed that treatment with NurOwn resulted in a statistically significant increase of neurotrophic factors and reduction in neurodegenerative and neuroinflammatory biomarkers that was not observed in the placebo treatment group."

160. Defendant Lebovits also explained the following:

> This clinical trial included a more severely affected ALS population compared to other recent ALS clinical trials. ***We identified a superior treatment response in a pre-specified subgroup of patients with less advanced disease***. We are in active discussions with the FDA who have expressed their eagerness to review the data and have committed to prioritize the review of this data. According, investors remained hopeful that the Phase 3 Trial results would support approval of NurOwn despite failing to reach its primary endpoint.

161. The "subgroup" of patients Lebovits was referring to in the above press release was in fact, not pre-specified. Investors later learned that:

> ***The Applicant states that these sub-group analyses were "pre-specified." However, it is important to note that these subgroup analyses were not prespecified for hypothesis testing and no prespecified municipality adjustment strategy was employed. Subgroup tests following overall nonsignificant tests in the population as a whole such as the Phase 3 study can only be considered exploratory and hypothesis-generating and do not constitute evidence of effectiveness to support marketing approval of MSC-NTF.***

162. The subgroup of patients while an ALSFRS-R score of 35 or over was a post hoc exploratory analysis that focused on the "floor effect." Scales that are bounded, meaning scales that contain finite upper and lower boundaries, such as the ALSFRS-R scale, may be subject to "ceiling" or "floor" effects, where the scale is no longer able to detect further deterioration or improvement. Once an item that is measured on the ASLFRS-R scale reaches zero, further decline

in the patients functioning skills cannot be measured, which can make the effects of a treatment difficult to measure. The Individual Defendants attempted to demonstrate that the lack of efficacy in the Phase 3 Trial overall was the result of an inability to detect efficacy in a subgroup that was allegedly impacted by the "floor effect."

163. Brainstorm Cell held a teleconference with the FDA on February 16, 2021, to discuss the development of NurOwn as a treatment for ALS. During this meeting, the FDA told Brainstorm Cell that it does not consider the results from the Phase 2 Study to provide any evidence of efficacy. The FDA also explained that the Phase 3 Trial also did not demonstrate a statistically significant benefit over the placebo for the overall Phase 3 population. Additionally, the FDA explained that it believed the Phase 3 Trial results to be negative overall. The FDA also told the Individual Defendants that it "does not consider submission of a BLA to be appropriate at this time. ***The available data do not meet the standard required for approval by either the traditional or accelerated pathway. While the applicant has the option of submitting a BLA with existing data, the Agency may refuse to file it. In that event, the Applicant may choose to File Over Protest***."

164. During this same meeting on February 16, 2021, the FDA discredited Brainstorm Cell's "floor effect" analysis, stating that the Company's "suggested 'floor effect' did not appear consistent across the study population. Subjects treated with placebo did not show the same 'floor effect' proposed for subjects who received [NurOwn]. Since the study population was randomized, and the [NurOwn] and placebo group were well-matched, a similar floor effect would expect to be present in both groups." Essentially, the FDA told Brainstorm Cell that NurOwn's inability to demonstrate efficacy in the Phase 3 Trial was absolutely not the result of any "floor effects."

165. Also, during the February 16, 2022 meeting, the FDA expressed concern about the number of deaths that occurred in the Phase 3 Trial's treatment group. The FDA explained that it "***remains concerned about the large number of deaths among subjects treated with [NurOwn] compared to that among subjects treated with placebo***." During the course of the Phase 3 Trial, ten patients in the treatment group died, while three died in the placebo group. Essentially, "***survival is the ultimate clinically meaningful outcome measure for a fatal disease like ALS. It is less likely to be affected by variations in assessment***." Additionally, patients in the Phase 3 Trial who were in the treatment group had higher number of life-threatening serious adverse events ("SAEs"), as well as SAEs with fatal outcomes compared to the placebo group, a higher rate of respiratory failure and dysphagia (swallowing difficulties), and a higher rate of pain (coccydynia and back pain).

166. The FDA also informed Brainstorm Cell during the February 16, 2021 meeting that if the Company intended to continue to develop NurOwn to serve as a potential treatment for ALS, it should "conduct another Phase 3 study this time incorporating Agency input regarding the study design."

167. Prior to the market opening on February 22, 2021, Brainstorm Cell informed investors in a press release only that the "FDA concluded from their initial review [of the Phase 3 Tial data the Company submitted] that the current level of clinical data does not provide the threshold of substantial evidence that FA is seeking to support a [BLA]. In addition, FDA advised that this recommendation does not preclude Brainstorm from submitting a BLA submission." The press release also stated that Brainstorm Cell would consult with experts, regulator advisors, and others before making a final determination as to whether or not the Company would submit a BLA to the FDA.

168. Following this news, the Company stock price fell $2.70 per share, from $6.90 to a close of $4.20 on February 23, 2021, amounting to a 39% decline.

169. Despite the harsh news from the FDA, Brainstorm Cell continued to conceal the FDA's concern regarding the number of deaths associated with the Phase 3 Trial's treatment group, as well as the fact that any deaths occurred at all. Brainstorm Cell also hid the FDA's invalidation of Brainstorm Cell's "floor effect" analysis and hypothesis that the Phase 3 Trial failed to reach statistical significance because of a subgroup that suffered from the "floor effect." The Company also concealed the FDA's recommendation that the Company conduct a new trial that (unlike the initial Phase 3 Trial) followed the advice of the FDA concerning trial design. The Company also continued to leave open the possibility of submitting a BLA. Each of these omissions caused the Company stock to continue to trade at prices that were artificially inflated by Defendant's fraudulent statements.

***The Company Decides to Submit a BLA to the FDA, Despite Clear Warning to Avoid Doing So***

170. Over the course of the next 18 months, the Company did not further discuss a potential BLA submission. The Company expressed to investors that the Company's conversations with the FDA needed to remain confidential, and that Brainstorm Cell would determine whether or not to submit a BLA once it published the results from the Phase 3 Trial.

171. During the Company's November 15, 2021 conference call with investors to discuss the third quarter of 2021, one analyst asked about the status of the NurOwn application with the FDA. In response, Defendant Lindborg responded: "we've been clear in our communications[…] before we make a decision about the firing of a BLA application of NurOwn, we intended to first publish the results from out trial in a peer-reviewed journal. And second, to meet with important members of the ALS community who were not involved in the conduct of our

Phase 3 Trial. As [Defendant Lebovits] just shared on this call, we've made great progress with these goals and immediately after the publication in this print, we will be prepared to speak to our plans for filing the BLA."

172. On August 15, 2022, the Individual Defendants announced that Brainstorm Cell would be submitting a BLA for NurOwn to the FDA. The Individual Defendants represented that a "correlation" in the statistical analysis of the fata from the Phase 3 Trial resulted in one of the "key," pre-specified secondary endpoints reaching statistical significance. The Individual Defendants explained that this correction "results in a statistically significant treatment difference of more than two points for an important secondary endpoint, average change from baseline in ALSFRS-R, ***in the pre-specified efficacy subgroup of participants with a baseline score of at least 35… the newly published results… employ the efficacy model as prespecified in the trial's statistical analysis plan…***"

173. The Individual Defendants held an investor conference call on the same day on August 15, 2022, where the Individual Defendants touted the results from "multiple subgroups," and post hoc analyses as well as biomarker analyses which purportedly correlated with the "clinical outcomes." Defendant Lebovits stated that:

> While performing routine quality control checks and preparations for upcoming BLA filing, we discovered an error in the statistical model, utilized by a vendor in the analysis of a key secondary endpoint. This is now being corrected… ***Though correcting the error resulted in a change that was relatively small numerically, it does have meaningful positive implications that reinforces and strengthens the conclusions of the Phase 3 study. With the correction, the Phase 3 data are stronger than originally thought as we have achieved statistical significance in a key important secondary endpoints for multiple subgroups, including the trial's pre-specified efficacy subgroup.*** The endpoint I'm referring to is average change from baseline to week 28 in ALSFRS-R score in the pre-specified subgroup and trial participants with baseline ALSFRS-R scores of at least 35, which is indicative of patients with less disease progression.

174. Defendant Lindborg stated the following:

> Although results showed the pretrial did no reach statistical significance on the primary or secondary endpoints, pre-specified and post hoc analyses showed a larger treatment benefit with NurOwn compared to placebo across both primary and secondary outcomes in patients with less advanced disease. In addition, data indicates NurOwn had an important effect on a wide range of biomarkers from all participants in the trial, which were shown to be statistically important to the clinical outcomes observed.

175. Defendant Lindborg further emphasized the importance of the efficacy subgroup analyses in the Phase 3 Trial, supposedly due to the ALSFRS-R floor effect, stating:

> I want to offer one other comment regarding the importance of these analyses, which might not be obvious. ***It's common to pre-specify subgroup analyses in large trials in the industry. However, in this trial, efficacy subgroup analyses play an important role in the evaluation of NurOwn's treatment effect because of the higher number of participants enrolled in this clinical trial with advanced ALS at baseline, which is a distinguishing feature of this trial, compared to other registration trials***.
>
> Given the insensitivity of the ALSFRS-R to measure disease progression in these study participants, ***analyses of trial participants less likely to be impacted by the ALSFRS-R floor effect are critical to the evaluation of NurOwn's treatment effect.*** Subgroup analyses are one strategy to do this. To reiterate a point made earlier, we believe these correlated analyses reinforce and strengthen the conclusion from NurOwn's Phase 3 Trial.
>
> …When we look at these subgroups that have just been published and when we look at any of the subgroups, [they are] what are allowing us to understand the treatment effect from this trial ***once we've minimized the effect of the lower end of the ALSFRS-R floor effect***…

176. During the call, one analyst name Daniel Walker questioned Defendant Lindborg further regarding the pre-specified secondary endpoints. In responding to these questions, Defendant Lindborg carefully emphasized that the subgroup of Phase 3 Trial participants with ALSFRS scores of 35 or above was a "pre-specified threshold," which carries a "different level of credence":

> So ***in terms of pre-specified and our endpoints***, our primary and secondary endpoints, it's always really critical that when we're conducting clinical research and this is true in academia, as well as in the industry, that we're thinking very carefully about the trial, the questions we want to answer, and then the appropriate ways to analyze the data and really bring forward evidence. ***So your question about***

> ***pre-specified analyses is important. These were identified before any data was observed in the trial and they therefore give objectivity and a different level of rigor to being able to draw conclusions from the trial. When we look at subgroups, for example, these are also carefully as we focused on the participants that were 35 or above. This was a pre-specified threshold.***
>
> ***So these analyses carry a different level of credence…***

177. Despite these statements, the FDA Briefing Document states:

> ***However, it is important to note that these subgroup analyses were not prespecified for hypothesis testing and no prespecified multiplicity adjustment strategy was employed. Subgroup tests following overall nonsignificant tests in the population as a whole such as the Phase 3 study can only be considered exploratory and hypothesis-generating and do not constitute evidence of effectiveness to support marketing approval of [NurOwn].***

178. The FDA Briefing Document stated the following regarding the alleged "floor effects":

> FDA did not observe a "floor effect" in the floor effect subgroup defined by any of the three definitions identified by the Applicant. ***If there was a "floor effect" in the Applicant-identified floor effect subgroup, the ALSFRS-R total score post baseline would have been bounded by a "floor," which would have prevented the score from much further decline. This is in direct contrast with the fact that the [NurOwn] "floor effect subgroup" had a drastically steeper decline in ALSFRS-R total score from baseline compared with the no floor effect subgroup or the placebo floor effect subgroup.*** At the same time, the magnitude of change between the placebo floor effect subgroup and the placebo no floor effect subgroup were comparable, which further puts into question the validity of the "floor effect" []. In addition, the [NurOwn] floor effect subgroup showed substantially worse CAFS ranking than the no floor effect subgroups while the two placebo subgroups were comparable[]. ***In conclusion, the lack of efficacy of MSC-NTF over placebo cannot be explained by a floor effect.***

179. During the August 15, 2022 investor conference call, Brainstorm Cell touted the new biomarker analyses from the Phase 3 Trial as supporting efficacy and the BLA submission. Defendant Kern stated, in relevant part"

> I won't give this away today, but what has been true across the board as we work to assess the relationships between biomarker data and clinical endpoints is that ***we consistently see biomarkers that are statistically relevant to clinical endpoints*** covering all these three important ALS pathways. The broad mechanism of action and NurOwn's ability to lower markers of inflammation and neurodegeneration in

> addition to increasing markers of neuro protection all appear to be important in explaining the clinical response that we have observed.

180. Defendant Lindborg emphasized that the biomarker data was consistent with the improved clinical outcomes, stating, in relevant part:

> ***When we look at our biomarker data and we see changes that were anticipated going in the direction that we expected with NurOwn and stability,*** which we also expected with placebo and we see very consistent conclusions across the ranges of the scale, the efficacy scale. That again we're very confident in the scale's ability to measure progression. ***We walk away with a set of data that we believe builds on each analysis and allows us to look at the trial results in total.***

181. Truthfully, the Phase 3 Trial's "positive" biomarker data correlated with worse clinical outcomes, not better. As the FDA Briefing Document stated, "subjects having higher reduction in CSF NfL level appeared to experience greater loss of function [] the opposite of what would be expected."

182. Brainstorm Cell submitted the BLA to the FDA on September 9, 2022.

183. The FDA issued an RTF letter to Brainstorm Cell on November 8, 2022. The RTF letter "detailed all the deficiencies in the BLA submission and provided the FDA's recommendations on how to resolve the deficiencies." The RTF letter informed the Company that, among other things, the BLA submission was "***scientifically incomplete to demonstrate substantial evidence of effectiveness, and that the manufacturing information was grossly deficient to ensure product quality***." Additionally, "examples of critical information not provided in the BLA submission include missing or inadequate control materials, validation of methods missing or incomplete, lack of data demonstrating manufacturing consistency, control strategy for prefilled syringe not provided, inadequate testing and facility information, and facilities not ready for inspection."

184. The Company issued a press release on November 10, 2022, informing investors of the RTF. The Company did not disclose the contents of the RTF, stating that the RTF "included

one item related to the trial not meeting the standard for substantial evidence of effectiveness and Chemistry, Manufacturing and Controls ("CMC") related items."

185. Following this news, the Company's stock price fell $1.22 per share to a close of $1.67 per share on November 10, 2022, amounting to a 42.21% decline.

***The Company Hides Material Information Regarding the Contents of the RTF and Chooses to File the BLA Over Protest***

186. The Company issued a press release announcing the Company's request for a Type A meeting with the FDA to "facilitate NurOwn's advancement following receipt for a refusal to file letter regarding the Company's new [BLA]." The press release downplayed the RTF, quoting Defendant Lebovits as stating: "our commitment to ALS patients and our belief in NurOwn's potential to address unmet medical needs remains unchanged, despite our receipt of a refusal to file letter regarding our new [BLA]." The press release also highlighted additional analyses that allegedly showed that "***after controlling for the impact of the ALSFRS-R floor effect, participants treated with NurOwn had a higher rate of clinical response and less function lost across 28 weeks compared to placebo***."

187. The press release also discussed the "new biomarker data" which "provided further evidence confirming NurOwn's multifaceted mechanism of action."

188. During an investor conference call on the same day, one analyst named David Bautz asked Defendant Lebovits to discuss the CMC issues, to which Defendant Lebovits responded:

> ***So the CMC issues are more trivial issues, it's not really costly. It's asking me some questions about some validation, some others, some are already in the BLA, and we have to point out where it is. Some where we anticipate most of the questions, we receive them as review questions. We don't see outside of the clinical comments any red flags.***

189. Then, one week before the Company's anticipated Type-A meeting with the FDA to discuss the RTF, on January 4, 2023, Defendant Kern resigned as the Company's CMO, without explanation.

190. On January 11, 2023, Brainstorm Cell had a Type-A meeting with the FDA to discuss the deficiencies that had been identified in the RTF. The Company chose not to discuss the CMC deficiencies, despite the FDA's concerns about the "gross[] deficien[cies] in manufacturing information" and numerous examples of "critical information" on CMC missing from the BLA.

191. During this meeting, the Individual Defendants presented the FDA with the Company's "floor effect" analyses. The FDA informed the Individual Defendants that "***the lack of efficacy of NurOwn over placebo cannot be explained by a floor effect***" and that "these findings from the exploratory subgroup analysis can only be used for hypotheses generation, not as evidence of effectiveness to support approval."

192. During the meeting with the FDA on January 11, the FDA described two possible options for the Company moving forward. First, the Company could "address these clinical and product issues and then submit a new BLA that contains evidence of effectiveness and evidence of safety ***from new adequate and well-controlled clinical investigations*** and describe all the necessary validation studies and document that the applicant's commercial manufacturing facilities were ready for inspection." The second option was to request that the BLA be filed over protest.

193. Then, on February 6, 2023, the Company notified the FDA of its request to file the BLA over protest, and re-filed the BLA the next day. On February 9, 2023, the Company received the meeting minutes from the January 11 Type A meeting.

194. While filing the BLA over protest, Brainstorm Cell submitted post-hoc exploratory analysis of the Phase 3 Trial's clinical data, and exploratory analysis of biomarker data, as well as additional CMC information.

195. With respect to clinical data, Brainstorm Cell performed three different retrospective analyses on an unblinded post-hoc subgroup, excluding patients the Company asserted showed a "floor effect." However, as previously discussed, Brainstorm Cell' "floor effect" analysis was flawed and spurious. First, Brainstorm Cell had no concrete definition for the "no floor effect subgroup." Instead, the Company used three distinct "no floor effect" subgroups. The fact that one group might show positive findings could simply be due to random chance. The post hoc subgroup analyses have a high risk of finding false positives. Second, the data demonstrated that NurOwn had a detrimental effect in the "floor effect" subgroups. Third, if there were truly a "floor effect" in the floor effect subgroup, the ALSFRS-R scores of patients in this subgroup would not have declined much further. However, the data showed that the "floor effect" subgroup had a drastically steeper decline in ALSFRS-R score from a baseline compared to the "no floor effect" subgroup or the placebo group. Accordingly, the Individual Defendants had no basis to support their assertion that the lack of efficacy in the overall Phase 3 Trial was due to the subgroup impacted by the "floor effect."

196. With respect to clinical data, Brainstorm Cell also submitted biomarker data as part of the BLA. However, there was a large amount of missing biomarker data. While Brainstorm Cell collected efficacy data up to week 28, the Company only collected biomarker data up to week 20. At week 20 up to 50% of the key biomarker data, including NfL, was missing. This degree of missing data compromises the validity of the Company's analysis. Further, the biomarker data was exploratory only because much of the analysis lacked multiplicity adjustment or formal hypothesis

testing. Therefore, any claim of statistical significance could simply be due to chance. Finally, the purportedly positive NfL biomarker data, i.e. a reduction in NfL (which is associated with neurodegeneration) was seen in subjects with poorer efficacy outcomes.

197. Regarding safety, as noted above, the data in the BLA showed a higher incidence of death in the NurOwn group, which shows a lack of survival benefit with NurOwn (at the very least), a higher incidence of SAE's, a higher incidence of respiratory failure and difficulty swallowing, and a higher incidence of pain.

198. With respect to CMC, the BLA was missing a large amount of manufacturing information and product data. First, Brainstorm Cell failed to assess, and demonstrate in the BLA, as required, that the product administered was comparable across the studies used to support the BLA and did not even show that the product was comparable in the two different sites that manufactured NurOwn administered in the Phase 3 Trial. Second, Brainstorm Cell did not show that it controlled variability of the product for the Phase 3 Trial. Third, Brainstorm Cell did not validate the product's production process, which is necessary to show that the manufacturing process is consistent. Fourth, one quarter of the doses administered in the Phase 3 Trial did not meet the intended dose requirements. Fifth, the level of NTF production, (i.e., the levels of neurotrophic factors normally produced by MSC to generate NurOwn) was highly variable across the product lots. Sixth, Brainstorm Cell claimed that NurOwn's mechanism of action involved secretion of molecules other than NTF but gave no manufacturing control strategy for any other purported mechanism of action. Relatedly, Brainstorm Cell's proposed mechanism of action in the BLA was inconsistent across the BLA and unclear. Seventh, the product in pre-filled syringes was not necessarily stable and Brainstorm Cell changed a critical reagent used to manufacture NurOwn without providing data showing the reagent was comparable to the one it previously used.

199. On March 27, 2023, Brainstorm Cell issued a press release informing investors that it filed the BLA using the file over protest procedure as well as "filed an amendment to the BLA which responds to most of the outstanding questions the FDA has posed." In an article released the same day in the online publication "Pink Sheet," Defendant Lindborg stated: "We have a well-conducted Phase III trial that really, by almost every standard, has operated exactly as planned," she said. "Randomization was very effective. We have a very high completion rate. We have fewer deaths than we expected. We have a very strong safety profile." Defendant Lindborg failed to disclose that there were over three times the number of deaths in the Phase 3 Trial's treatment arm compared to placebo, a safety red flag that FDA raised to the Individual Defendants in February 2021.

200. On the Company's "Business Update Call" to investors the same day, Defendant Lindborg gave investors a "high-level overview" of the timeline leading to Brainstorm Cell's decision to file the BLA over protest. Lindborg discussed the Company's January 11, 2023 Type A meeting with FDA. Lindborg represented that FDA presented the Company "with multiple options to return the BLA to regulatory review" and that filing the BLA over protest not only allowed the Company to "reach an AdComm in the shortest amount of time" but "also enabled us to respond to matters identified by the FDA in its refusal to file letter, through amendments to the existing BLA without having to withdraw and resubmit the application, which would have taken many months. So in other words, there was no downside utilizing the File Over Protest pathway, while any other pathway would have lengthened the timelines and Ad Comm and PDUFA date."

201. During the call, Defendant Lindborg stated that the Phase 3 Trial's failure to reach its primary endpoint was "very likely driven by participants who entered the trial with advanced ALS, who fell victim to the floor effect of the ALS functional rating scale." Defendant Lindborg

again represented, referring to Phase 3 Trial participants with baseline ALSFRS-R scores of 35 or above, that "***a pre-specified subgroup with less advanced ALS, for the primary and secondary endpoints as specified in the protocol and analysis plan***….there was a larger treatment effect across all endpoints with NurOwn compared to placebo with the statistically significant difference observed on a key endpoint for change from baseline in the ALSFRS-R to week 28 with a p-value of 0.05."

202. Given the Individual Defendants' emphasis on the "floor effect" subgroup analyses, Defendant Lindborg represented that "***the FDA has certainly seen this data and clearly and has not disagreed with the statements we made***." Defendant Lindborg stated that "I think that will become clear at the advisory committee meeting. We've presented clearly as we can and I think very objectively when you take data points on a, the gold standard scale, the ALS functional rating scale that goes back to zero, the baseline. It's pretty objective to say that we can't measure ongoing decline on these items and as you have an accumulation of this, it creates a problem, ***the FDA certainly has seen this data and clearly and has not disagreed with the statements we've made***."

203. On March 30, 2023, Brainstorm Cell held an investor conference call where Defendants Lebovits and Lindborg again downplayed the RTF and represented that through an amendment to the BLA, the Company had "conducted much of the work necessary" to respond to and remediate the CMC deficiencies FDA set forth in RTF letter.

204. In discussing the "File over Protest pathway," Defendant Lebovits stated that, "[d]espite its name, this mechanism is a standard regulatory procedure and is not inherently antagonistic. In fact, we collaborated constructively with the FDA before the agency provided us

with several regulatory options that would reactivate the BLA in order to allow NurOwn to be discussed as an ADCOM"

205. In discussing the contents of the RTF Letter, Defendant Lebovits chose to "speak about how [the Company] plan[s] to address theses points," stating, in relevant part:

> …The RTF letter included o***ne item related to the trial not meeting the standard for substantial evidence of effectiveness*** or the primary endpoint [Indiscernible] statistical significance and the remaining items related to chemistry manufacturing and controls in short CMC. ***Given our exemplary record of high quality manufacturing***, we have full confidence that will be able to remediate each of these points in a straightforward manner.
>
> ***In fact, we already have conducted much of the necessary work in a short time frame and submitted an amendment to the BLA on March 7, 2023, which responds to the majority of the manufacturing items raised in the letter.*** We work to respond to the few remaining manufacturing items is ongoing and would be complete in due time. The remaining items RTF letter and ***the only item related to our clinical data*** that will be the focus. That will be the key point of the discussion.

206. Defendant Lindborg also discussed Brainstorm Cell's ability to secure an Advisory Committee Meeting, stating, "securing an AdComm has been central to our strategy, ***because we have a robust and compelling data set*** that will benefit from a deep and thoughtful discussion at this public meeting. ***While our Phase 3 trial NurOwn and ALS did not reach statistical significance on the primary endpoint, we firmly believe that the totality of evidence from the trial will ultimately support approval***."

207. Also during the March 30, 2023 call, Defendant Lindborg discussed NurOwn's safety, stating, in relevant part:

> We've summarized that very completely, very thoroughly and certainly that will be summarized at our ADCOM. This is a dimension that the physicians closest to our trial, including our Data Safety Monitoring Board, ***have continued to express that there were no safety concerns***, that were existed in the trial or that emerged as a – from a profile of NurOwn and that safety has been clarified to their complete satisfaction.

208. The Individual Defendants continued to represent the Phase 3 Trial as demonstrating efficacy. On a May 15, 2023 investor conference call, Defendant Lindborg stated that, "***[a] thorough analysis of NurOwn Phase 3 data show evidence of clinically meaningful effectiveness and we are further encouraged by the strong and consistent biomarker data, which are predictive of clinical response to the trial span pathways and important to ALS***."

209. During this call, Defendant Lindborg further discussed the allegedly pre-specified subgroup of Phase 3 Trial participants not impacted by the floor effect, as well as the biomarker data, stating, in relevant part:

> The process for approval of any BLA will be determined primarily by the body of evidence generated. ***And on this front, we firmly believe that NurOwn's data package is strong enough to support regulatory approval…***As disclosed previously, the Phase 3 trial did not reach statistical significance on the primary and secondary endpoints. ***However, in a pre-specified group of participants with less advanced disease at baseline, there was a clinically meaningful treatment response on the primary and secondary endpoints with NurOwn compared to placebo.*** On the secondary endpoint, which was favored by the FDA, the average change from baseline to week 28 and the ALS functional rating scale, the treatment difference was statistically significant at the level of P> 0.05. These findings are important as looking at this pre-specified subgroup enabled us to focus on data that is not as impacted by the floor effect in the scale.…
>
> …So in summary, we can objectively show that the ALS functional rating scale was unable to measure ongoing decline in participants with the most advanced ALS who were enrolled in the trial, a unique sample of trial participants relative to other approved products. ***Based on the data, I've just walked you through, we have clinical and biomarker data that demonstrate evidence of significantly better outcomes in participants treated with NurOwn***. And we have amassed efficacy and safety data that we believe supports a positive benefit risk evaluation of NurOwn.

210. On June 6, 2023, the Company announced that the FDA planned to convene the Advisory Committee meeting to review the BLA on September 27, 2023. This meant that if FDA approved NurOwn, the Company could begin marketing it in December of that year.

211. In preparation of the AdComm meeting, the Individual Defendants reiterated that the Phase 3 Trial demonstrated statistically significant results "once you're able to eliminate

advanced patients" and that data from a "new analysis" of the Phase 3 Trial's biomarker results supported NurOwn's "clinically meaningful effectiveness." For example, in an August 14, 2023 Press Release, Defendant Lindborg represented that Brainstorm Cell "recently delivered an important presentation…***The data from this new analysis showed that treatment with NurOwn significantly elevated markers of neuroprotection and lowered markers of neuroinflammation and neurodegeneration, including neurofilament light (NfL). Reductions in plasma NfL are believed to be a predictor of clinical benefit in ALS***."

212. That same day, in an investor conference call, Defendant Lebovits responded to analysts' questions concerning the upcoming AdComm, stating, "***[b]ut when you're able to eliminate the advanced patients, we see both in the primary and secondary endpoints, statistical[ly] significant results. Of course, we're not going to lay it out here. That's what we're going to do at the ADCOM***."

***The Individual Defendants Announce the Result of the AdComm and the FDA Releases the Briefing Document That Exposed the Defendant's Prior Misstatement***s

213. In advance of the FDA Advisory Committee, on September 25, 2023, the FDA released the Briefing Document. On September 27, 2023 the Advisory Committee meeting took place, as planned. The Advisory Committee Members voted 17:1 against FDA approval of NurOwn.

214. Defendant Lindborg was present at the Advisory Committee to represent the Company. Defendant Lindborg herself admitted at the Meeting, when asked about CMC deficiencies, "***we acknowledge that additional works needs to be done and complete to fully satisfy the FDA requirements***."

215. In discussing the RTF, the Briefing Document and the Advisory Committee transcript revealed that:

> ***On initial receipt of the BLA, FDA determined that the submission was scientifically incomplete to demonstrate substantial evidence of effectiveness, and that the manufacturing information was grossly deficient to ensure adequate product quality. Examples of critical information not provided in the BLA submission include missing or inadequate control of materials, validation of methods missing or incomplete, lack of data demonstrating manufacturing consistency, control strategy for prefilled syringe not provided, inadequate manufacturing and testing facility information, and facilities not ready for inspection.*** FDA therefore refused to file the submission and detailed these deficiencies in a Refuse to File (RTF) letter to the Applicant. The Applicant elected to request that the BLA to be filed over protest, and subsequently provided further ***retrospective analyses and biomarker results***.
>
> ***
>
> …[T]he BLA did not contain information ***on numerous critical elements*** of product manufacturing, and FDA determined that a substantive review was not possible. ***The extent of the deficient information, that facilities were not ready to manufacture the product, and the fact that some clinical validation studies had yet to be initiated, suggested that the best path forward would be to submit a new BLA***.

216. The Briefing Document further explained that Brainstorm Cell had not remedied the FDA's manufacturing concerns contrary to the Individual Defendants' prior assurances, stating, in relevant part: "In addition to the above clinical and statistical concerns, the review team has substantial concerns about product manufacturing. Those issues have yet to be resolved."

217. In discussing safety, the Briefing Document stated, in relevant part:

> ***Survival in the Phase 3 study was worse at study completion for subjects who received [NurOwn]. A total of 13 deaths occurred during the post-treatment follow up with 10 deaths in the [NurOwn] group and 3 deaths in the placebo group;***
>
> ***
>
> ***Particularly concerning was the larger number of deaths in the [NurOwn] group compared to the placebo group.***
>
> ***
>
> ***Survival is the ultimate clinically meaningful outcome measure for a fatal disease like ALS. It is less likely to be affected by variations in assessment.***

***

> TABLE 4 Safety Summary: ***The [NurOwn] group had higher numbers of life-threatening SAEs54 and SAEs with fatal outcomes*** compared with the placebo group.
>
> Safety Summary: (1) ***the higher incidence of deaths in the [NurOwn] subgroup with indicates lack of survival benefit of [NurOwn] and warrants further investigation***; (2) there appears to be a higher incidence of respiratory failure and dysphagia in the [NurOwn] group; (3) there appears to be a ***higher incidence of pain*** (e.g. coccydynia and back pain) in the [NurOwn] group.

218. Dr. Gumei Lui, an Advisory Committee member from the FDA's office of Clinical Evaluation voiced concerns over the Phase 3 Trial's alarming safety signals, the risks of which were even more concerning, given NurOwn's complete absence of treatment benefit:

> ***During the study, there were more deaths in the MSC-NTF group than in the placebo group…***In addition, MSC-NTF patients experienced a ***higher frequency of pain, such as back pain, musculoskeletal pain, and coccydynia, which would negatively impact the quality of life, especially considering that there was no treatment benefit.*** Muscle spasms and dysphagia also appeared to have occurred more frequently in the MSC-NTF group, ***which may suggest continued disease progression in MSC-NTF treated patients.***
>
> ….***We would like to emphasize that this is not a case where an investigational product demonstrates a clear, consistent, and favorable trend, but it just misses the bar for statistical significance. Rather, as shown here, for MSC-NTF, there is no such trend. Furthermore, all-cause mortality, shown in the bottom row, was much higher in MSC-NTF group, with ten deaths by week 28, compared to three deaths in the placebo group.***

219. In discussing the Phase 3 Trial's design and the Company's interactions with the FDA, the Briefing Document and the Advisory Committee Meeting Minutes revealed that:

> ***The primary efficacy endpoint of the Phase III study was based on comparing the ALSFRS-R linear regression slope before and after treatment…. FDA and applicant did not reach agreement on the primary efficacy endpoint for the Phase III study.***

***

> ***Change in 'slope' of ALSFRS-R is of unclear clinical significance, and therefore would not be suitable as the primary efficacy endpoint in a study intended to provide primary evidence of effectiveness in support of a marketing application.***

> As discussed earlier, modeling ALS progression as a linear function based on change in ALSFRS-R over time is inaccurate, because short intervals of plateau or even improvement are not uncommon. ***Moreover, an acceptable clinical outcome measure should reflect whether a patient feels better or survives longer. A change of 1 point or more in the ALSFRS-R total score compared to a patient's baseline corresponds to a clinically meaningful difference in functional ability; in contrast, the clinical meaningfulness of a change in the slope of the regression line is unknown."***
>
> ***
>
> ***The Phase Two study failed to show a statistically significant benefit of MSC-NTF for treatment of ALS. However, the applicant conducted an exploratory subgroup analysis of rapid progressors versus slow progressors.*** The applicant defined rapid progress as patients with at least two points declined from screening to baseline in approximately three months in their ALSFRS-R total score. The applicant defined slow progress as patients with less than two points declined from screening to baseline in their ALSFRS-R total score***. FDA communicated to the applicant concerns about the definition of rapid progressors and the exploratory nature of the subgroup findings. However, for the Phase Three study, the applicant then selected only patients who appear to be rapid progressors. Phase Three study also failed to demonstrate a treatment benefit of MSC-NTF on any of the pre-specified primary and secondary efficacy endpoints.***

220. At the Advisory Committee, CBR Statistical Reviewer Dr. Xue Mary Lin explained the Individual Defendants' failure to follow FDA's advice concerning the Study's design enabled the Company to manipulate the Phase 3 Trial in a way that would generate misleading, false positive results to support a claim of efficacy, stating, in relevant part:

> ***[NurOwn] showed no efficacy compared to placebo on primary and all key secondary endpoints in the overall population. BCT-002-US [The Phase 3 Study] was a failed study. The applicant then tried to rescue the failed study by exploring various subgroups. However, we reiterate the statistical principle that exploratory and post hoc subgroup analysis cannot provide substantial evidence of effectiveness to support regulatory approval because such analysis has a high risk of obtaining false positive results***.

221. The FDA Briefing Document further uncovered that the Phase 3 Trial's subgroup analyses focusing on floor effect were ***not*** prespecified, stating, in relevant part:

> The following subgroup analyses were performed: 1) Subjects with duration since onset of symptoms <1.5 versus ≥1.5 years; 2***) Subjects with baseline ALSFRS-R Score <35 versus ≥35;*** 3) Riluzole use; 4) Sex (male versus female); 5) Race (White

> versus Black or African American). The Applicant also performed analyses on additional subgroups including age group <55 versus ≥55 years, and site of ALS onset: limb or limb and bulbar.
>
> ***The Applicant states that these sub-group analyses were "pre-specified." However, it is important to note that these subgroup analyses were not prespecified for hypothesis testing and no prespecified multiplicity adjustment strategy was employed. Subgroup tests following overall nonsignificant tests in the population as a whole such as the Phase 3 study can only be considered exploratory and hypothesis- generating and do not constitute evidence of effectiveness to support marketing approval of MSC-NTF.***
>
> Data from exploratory subgroup analyses of primary endpoint suggested possible benefit for MSC-NTF recipients in two subgroups: male subjects with ALS, and subjects with ALS with baseline ALSFRS-R ≥35.… ***[T]he Applicant considers the findings in subjects with ALS with baseline ALSFRS-R ≥35 as evidence of effectiveness. FDA considers that findings from both subgroup analyses could be spurious, as is often the case for such exploratory subgroup analyses.*** The Applicant may conduct additional well-controlled clinical study(ies) in subjects with high baseline ALSFRS-R to assess the efficacy and safety of MSC-NTF; ***however, exploratory subgroup analysis data from the completed Phase 3 study cannot serve as evidence of effectiveness.***
>
> ***…Prespecification is the cornerstone of reliable regulatory evidence. Without a prespecified multiple hypothesis testing strategy, the subgroup analysis of patients with baseline ALSFRS-R score greater than or equal to 35 is an exploratory analysis.*** In the presence of an overall negative trial result, this subgroup analysis may be used to generate a hypothesis for another trial. ***However, they cannot be used to rescue the trial because of a large chance of a false positive finding.***

222. In discussing NurOwn's purported efficacy, the Briefing Document and the Advisory Committee minutes uncovered that there was actually no evidence to support the Individual Defendants' claims that NurOwn demonstrated any clinical benefit or efficacy. Even the Individual Defendants' statement that the Phase 3 Trial tailed to reach its endpoint because of a "floor effect" was misleading because no "floor effect" existed given that ALSFRS-R scores of Phase 3 Trial participants in the "floor effect" groups continued to decline, stating, in relevant part:

> The Applicant ***performed three different retrospective analyses on an unblinded, post-hoc subgroup from the Phase 3 study***, excluding in each certain subjects based on the assertion of a 'floor effect' in the ALSFRS-R according to different criteria. A floor effect refers to the insensitivity of an outcome measure to

differences at the lower end of an assessment scale. ***In this case, the Applicant claims that a floor effect results in the plateauing of ALSFRS-R total scores over time, during which further deterioration of function cannot be measured. However, no floor effect was demonstrated in the analyses. In addition, floor effect would not be expected in the assessment of survival or biomarkers. Of note, when assessed by change in the ALSFRS-R total score from baseline to Week 28, the MSC-NTF subjects ostensibly affected by a 'floor effect' in fact experienced a numerically larger decline in function over time than did the correspondence placebo subjects.*** This result indicated continued deterioration of function and suggests lack of treatment benefit for MSC-NTF subjects.

FDA did not observe a "floor effect" in the floor effect subgroup defined by any of the three definitions identified by the Applicant***. If there were a "floor effect" in the Applicant-identified floor effect subgroup, the ALSFRS-R total score post baseline would have been bounded by a "floor," which would have prevented the score from much further decline. This is in direct contrast with the fact that the MSC-NTF "floor effect subgroup" had a drastically steeper decline in ALSFRS-R total score from baseline compared with the no floor effect subgroup or the placebo floor effect subgroup.*** At the same time, the magnitude of change between the placebo floor effect subgroup and the placebo no floor effect subgroup were comparable, which further puts into question the validity of the "floor effect" (Figure 12 [using Definition 1] and Figure 14 [using Definition 3]). In addition, the MSC-NTF floor effect subgroup showed substantially worse CAFS ranking than the no floor effect subgroups while the two placebo subgroups were comparable Figure 13.

***In conclusion, the lack of efficacy of MSC-NTF over placebo cannot be explained by a floor effect.***

***

After the fact, analyses by the sponsor found that a subsample of the highest functioning participants of baseline were significantly more responsive to the MSC-NTF than to placebo. Such a post-hoc finding, however, was biased towards a false positive result ***and was invalidated by the FDA review showing that there was no evidence of a sponsored hypothesized floor effect regarding motor function declines from baseline through week 28.*** Laboratory assays and facility inspections have yet to verify the quantity and central nervous system dispersion of cells and trophic factors delivered with each injection…..

***….We would like to emphasize that this is not a case where an investigational product demonstrates a clear, consistent, and favorable trend, but it just misses the bar for statistical significance. Rather, as shown here, for MSC-NTF, there is no such trend.***

***

> …The applicant has spoken often today of the totality of evidence, including in Dr. Wei's presentation about robustness and consistency. ***But in their presentation totality and consistency of efficacy only apply to the exploratory subgroup analysis. True totality of evidence would include a failure on primary and all key secondary endpoints in the overall study population plus suggestion of survival disadvantage.*** This analysis is subject to the same inflated chance of positive findings as the applicant's other exploratory and post hoc subgroup analysis with additional multiple testing issues due to further exploration. ***The p values are uninterpretable.*** The permutation test does not protect from uncontrolled type one error inflation associated with post hoc or exploratory testing in any way. ***Methodological papers cited by the applicant do not propose this method be applied to post hoc or exploratory subgroups.***
>
> The applicant's claim of effectiveness relies on subgroup analysis. However, with breaking of randomization, subgroup analyses are subject to bias and incidental findings, and it must always be interpreted with caution…
>
> ***
>
> ***In summary, two randomized, double blind, placebo-controlled studies failed to show efficacy for MSC-NTF. Survival data from the Phase III study were limited and unfavorable. The subgroup analyses can only be considered exploratory. The lack of efficacy in the studies cannot be explained by a floor effect. Biomarker analyses are also exploratory. And the correlation analyses do not support clinical benefit. Finally, product characterization and the manufacturer controls are inadequate.***
>
> ***In conclusion, the totality of data submitted in this BLA does not demonstrate substantial evidence of effectiveness of MSC-NTF for the treatment of ALS or the subgroup of ALS. New, adequate, and well-controlled clinical studies would be needed to provide substantial evidence of effectiveness for the treatment of patients with ALS or for the treatment of patients with mild to moderate ALS.***

223. In discussing the Phase 3 Trial's biomarker data as supporting efficacy, the Briefing Document and Advisory Committee Meeting Transcript revealed, that the allegedly positive biomarker data correlated with ***worse*** clinical outcomes, undermining any claim that the biomarker data demonstrated a benefit with NurOwn. The Briefing Document stated, in relevant part:

> ***The applicant's biomarker analyses were exploratory and did not support clinical benefit.***
>
> ***

> Although CSF sampling up to 20 weeks after the first MSC-NTF treatment did identify some biomarkers suggesting that biological drug protects neurons ***these analyses were plagued by missing data in approximately half the sample, and the levels of the biomarkers were mostly not correlated with the functional outcomes.***
>
> ***
>
> ***a reduction in NfL is expected to be associated with reduction in clinical decline of ALSFRS-R total score. However, in the current data set, patients experiencing greater loss of function appears to have a higher reduction of NfL, the opposite of what would be expected.***
>
> ***
>
> ***…I looked at the neurofilament data and I think the FDA presented a very good explanation of the data and why it isn't quite what the sponsor is suggesting….And the relationship between neurofilaments and the efficacy with looking at the ALSFRS-R data that was completely not convincing and I think it was the most random plot that I've ever seen*** that, through which a line was drawn. Anyway, that's how I feel. With regard, again, to Tofersen, they actually found that the neurofilament result dropped already before they saw an improvement. And so, they actually were able to use that as a marker for efficacy. And as I said, that was not just, a five to ten percent decrease, but it was more like a 50 to 70% decrease.

224. Individuals present at the Advisory Committee meeting also harshly criticized Brainstorm Cell's misleading claims. One participant, Dr. Diana Zuckerman, President of the National Center for Health Research and former Yale faculty member, residential director at Harvard, and Bioethics fellow at UPenn stated, in relevant part:

> ***With all due respect, it is not appropriate to combine non-significant results into a significant trend because the more comparisons you make, the more likely one of them would have been statistically significant. But in this case, none of them were. Perhaps most importantly, more patients taking the treatment died. At 28 weeks, 10 of the 95 on the treatment arm had died compared to three deaths of 94 in the placebo group. So, that's more than triple the number of deaths. The Chi-squared analysis is statistically significant. The patients who died during this treatment are not here today, and I want to represent those patients' results, which haven't gotten much attention so far. The improvement at week 28 was the same for the treatment group as the placebo group: 14% improved. This should remind us that some ALS patients will improve even with no treatment. And that's why a controlled trial is so important and why individual success stories, however heartening, can be misleading.***

> ***In conclusion, patients deserve clear evidence so that they can make informed decisions. And we all deserve an FDA that approves treatments based on scientific evidence***. Patients should have the option of being in a free clinical trial or expanded access, ***but it would be unconscionable for patients to pay for this unproven treatment, which they would do if the FDA approved it.***

225. An expert on bioethics for the FDA Advisory Committee panel named Lisa Lee spoke out against the Individual Defendants' claims of efficacy as ethically problematic and misleading:

> And I would just like to say that there's absolutely no doubt that ALS is a devastating disease and that there's an urgent need for treatments that are effective. I think we heard from our public commenters, patients and families need hope. ***But providing false hope can be ethically problematic and false hope is provided when the probability of a positive outcome is overestimated. And I think that seems to be the case here creating false hope can be considered a moral injury and the use of statistical magic or manipulation to provide false hope, I think, is problematic both in this current application as well as for the integrity of the drug and device approval process for at large, so I'm worried about what was demonstrated today that might be false hope for persons with ALS or their caretakers and of course, for their loved ones. Several comments that generate false hope that gave me pause today are things like efficacy was shown in four clinical trials, and I don't think the data consistently support this claim or something like the totality of the evidence. It shows efficacy and I think post hoc and biomarker analyses here adding that to the totality of the evidence is mixing evidence with anecdote. And this generates positive outcomes that I believe are overestimated. I think there's no denying that effective treatments are needed, but comments such as 30,000 people with ALS will die while we wait for another trial, these kinds of comments are misleading.***

226. The only voting patient representative who was present at the Advisory Committee meeting, Alex Buckley voted against approval of NurOwn despite the anecdotal evidence some ALS patients provided at the Advisory Committee meeting, stating:

> ***So, I looked at this through the lens of is this drug safe and is it effective? I didn't find that it was effective. It seemed to me like there's more evidence to the contrary. And then as to the issue of safety, it seems to me it's not as safe as maybe the sponsor would like it to be given the number of deaths in the [NurOwn] group versus the control group.***

227. Brainstorm Cell held a Business Update Call less than one month after the Advisory Committee meeting, during which Defendant Lebovits informed investors that

Brainstorm Cell would conduct another trial, this time entering an SPA with the FDA, which was something that the FDA had urged the Company to consider, beginning in 2016. Defendant stated: "***we want to align with the FDA*** on how this is going to be done. ***They want to align with us, which is a very good thing. Maybe even a SPA***. So that's why I want to be careful before throwing [trial] design out."

228. Analysts immediately noted the inconsistencies between Defendant Lebovits's above statement and those made previously. In addressing these inconsistencies, Defendant Lebovits stated that:

> ***You ask me, how do we have the strength? But we have a wonderful team.*** [ ] .And the FDA asking for [a] trial. So that's great, ***not in a position to go into other inside stories within FDA, I don't think that's the right thing for the company to do.*** That's great. I appreciate all the answers. Thanks so much.
>
> ***
>
> "I think we did a wonderful outstanding job representing the outcome [of the Phase 3 Trial]…."

**False and Misleading Statements**

***February 18, 2020 Investor Conference Call***

229. Brainstorm Cell held a conference call on February 18, 2020 to discuss its Fourth Quarter of 2019 earnings. During the call, the Individual Defendants reassured investors that the Phase 3 Trial was "aligned with FDA view." Defendant Lebovits gave a "more detailed update on [the Company's] recent meeting with the FDA," stating, in relevant part, "the FDA confirmed that the full results of Phase 3 trial is collecting relevant data critical to the assessment of NurOwn's efficacy. ***The FDA also commented that this is a well-designed trial***."

230. During the same call, Defendant Kern discussed the meeting with the FDA, stating that, in relevant part:

> The most important outcome of the discussion, of course, was that ***they confirmed we're completing a well-run study***. It is a very high-quality study, and the data that will be collected at the end of this study is relevant and critical to the assessment of NurOwn efficacy. ***It's an important confirmation for us…We obviously were very reassured by their position***.

231. During this same call, Jason Kolbert of Dawson James asked Defendant Kern about the FDA's views on the Phase 3 endpoint. Defendant Kern responded by stating that the recent guidance document was "one of the reasons why [the Company] needed to have a realignment" and that the ALSFRS-R "really forms the foundation for that."

***November 17, 2020 Press Release***

232. Before the market opened on November 17, 2020, Brainstorm Cell issued a press release announcing the top-line results from the Phase 3 Trial, disclosing that the Phase 3 Trial did not meet statistical significance in its primary efficacy endpoint, but purportedly showed "numerical improvements" in the treatment group, compared to placebo, across primary and secondary efficacy endpoints.

233. Despite failing its primary endpoint, the Company represented in the press release that NurOwn demonstrated a "clinically meaningful treatment response" across the primary and key secondary endpoints, "in an important ***pre-specified*** subgroup with early disease based on ALSFRS-R baseline score $\leq$ 35." The Company also represented in the press release that "Cerebrospinal fluid (CSF) biomarker analyses confirmed that treatment with NurOwn resulted in a statistically significant increase of neurotrophic factors and reduction in neurodegenerative and neuroinflammatory biomarkers that was not observed in the placebo treatment group."

234. In the press release, Defendant Lebovits stated that, "[t]his clinical trial included a more severely affected ALS population compared to other recent ALS clinical trials. ***We identified a superior treatment response in a pre-specified subgroup of patients with less***

***advanced disease***. We are in active discussions with the FDA who have expressed their eagerness to review the data and have committed to prioritize review of this data."

235. Following this news, on November 17, 2020, the Company's stock price fell $7.88 per share, from $11.90 per share to a close of $4.02, amounting to a 66% decline.

236. The November 17, 2020 press release was false and misleading because it made and/or omitted material that was necessary to make the press release not misleading because Defendant knew or recklessly disregarded but failed to disclose that: (a) the group of patients with an ALSFRS-R score of 35 and above was not prespecified, but was rather exploratory, a critical distinction, especially because "prespecification is the cornerstone of relable regulatory evidence and thus the results from post hoc exploratory analysis cannot constitute evidence of effectiveness; (b) the FRA told the Company during the November 19, 2019 meeting that the Company should not only enroll rapid progressors in the Phase 3 Trial and that the subgroup results were misleading and therefore would not be sufficient to support FDA approval; and (c) the Phase 3 Trial's purportedly positive biomarker data corresponded with worse clinical outcomes, as patients with higher reduction of NfL experienced a greater loss of function.

***February 22, 2021 Press Release***

237. The Company informed investors in a press release on February 22, 2021 that the "FDA concluded from their initial review [of the Phase 3 Trial data the Company submitted] that the current level of clinical data does not provide the threshold of substantial evidence that FDA is seeking to support a [BLA]. In addition, FDA advised that this recommendation does not preclude Brainstorm from submitting a BLA submission." The press release stated that Individual Defendants would consult with experts, regulatory advisors, and others before making a final decision as to whether to submit a BLA to FDA.

***2021 Proxy Statement***

238. On November 4, 2021, Brainstorm Cell filed the 2021 Proxy Statement with the SEC. Defendants Frenkel, Arbel, Almenoff, Polverino, Taub, Yablonka, and Bairu solicited to 2021 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

239. The 2021 Proxy Statement called for shareholder approval of, *inter alia,*: (1) the reelection of Defendants Arbel, Almenoff, Frenkel, Polverino, Taub, Yablonka, and Bairu to the Board; (2) compensation of the Company's named executive officers on a non-binding advisory basis; and (3) the ratification of the appointment of Brightman Almagor Zohar & Co., a firm in the Deloitte Global Network, as the Company's independent registered public accounting firm.

240. With respect to the Company's Risk Management and Oversight Process, the 2021 Proxy Statement stated the following:

> The Board takes an active role, as a whole and at the committee level, in overseeing management of our Company's risks. Generally, the entire Board, the Audit Committee and the GNC Committee are involved in overseeing risks associated with the Company and monitor and assess those risks in reviews with management and with the Company's outside advisors and independent registered public accounting firm. The Audit Committee reviews regulatory risk, operational risk and enterprise risk, particularly as they relate to financial reporting, on a regular basis with management, the Company's independent registered public accounting firm and the Company's outside consultants and advisors. In its regular meetings, the Audit Committee discusses the scope and plan for the internal audit and includes management in its review of accounting and financial controls, assessment of business risks and legal and ethical compliance programs. The GNC Committee monitors the Company's governance and succession risk by review with management and outside advisors. The GNC Committee also monitors CEO succession and the Company's compensation policies and related risks by reviews with management. The GNC Committee periodically reviews our compensation programs for employees to assure that these programs do not create risks that are reasonably likely to have a material adverse effect on the company.

241. Regarding the Code of Ethics, the 2021 Proxy Statement noted that the Audit Committee was responsible for "assist[ing] the Board in fulfilling its responsibilities to

stockholders concerning [the Company's] financial reporting and internal controls, and facilitates open communication among the Audit Committee, Board, outside auditors and management."

242. The 2021 Proxy Statement was materially false and misleading because it failed to disclose that, contrary to the 2021 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing and/or permitting the Company to issue false and misleading statements, and were not complying with the Code of Ethics.

243. The 2021 Proxy Statement also failed to disclose, *inter alia*, that: (a) the subgroup of patients with an ALSFRS-R score of 35 and above was not prespecified but was instead exploratory, a critical distinction given that "prespecification is the cornerstone of reliable regulatory evidence" and results from post hod exploratory analysis cannot constitute evidence of effectiveness; (b) the FDA told the Company at the November 18, 2019 meeting that the Company should not only enroll rapid progressors in the Phase 3 Trial and also that subgroup results were misleading and therefore would not be sufficient to support FDA approval; and (c) the Phase 3 Trial's allegedly positive biomarker data corresponded with worse clinical outcomes, as patients with higher reduction of NfL experienced greater loss of function, which was an entirely unfavorable result that does not support clinical benefit.

244. As a result of Defendants Arbel, Almenoff, Frenkel, Polverino, Taub, Yablonka, and Bairu causing the 2021 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to re-elect each of them to the Board, thus allowing them to continue breaching their fiduciary duties to the Company.

***August 15, 2022 Press Release***

245. On August 15, 2022, after nearly a year and a half of silence concerning the potential submission of a BLA, on August 15, 2022, before the market opened, Brainstorm Cell

issued a press release announcing its decision to submit a BLA to the FDA for NurOwn for the treatment of ALS. The press release explained that this correction "results in a statistically significant treatment difference of more than two points for an important secondary endpoint, average change from baseline in ALSFRS-R ***in the prespecified efficacy subgroup of participants with a baseline score of at least 35… the newly published results… employ the efficacy model as prespecified in the trial's statistical analysis plan***."

***August 15, 2022 Investor Conference Call***

246. On an investor conference call on August 15, 2022, the Individual Defendants discussed the results from the "multiple subgroups," including the Phase 3 Trial's "pre-specified efficacy subgroup" and also the biomarker analyses which allegedly correlated with the "clinical outcomes." During the call, Defendant Lebovits stated that, in relevant part:

> While performing routine quality control checks and preparations for upcoming BLA filing, we discovered an error in the statistical model, utilized by a vendor in the analysis of a key secondary endpoint. This is now being corrected... ***Though correcting the error resulted in a change that was relatively small numerically, it does have meaningful positive implications that reinforces and strengthens the conclusions of the Phase 3 study. With the correction, the Phase 3 data are stronger than originally thought as we have achieved statistical significance in a key important secondary endpoints for multiple subgroups, including the trial's pre-specified efficacy subgroup.*** The endpoint I'm referring to is average change from baseline to week 28 in ALSFRS-R score in the pre-specified subgroup [of] trial participants with baseline ALSFRS-R scores of at least 35, which is indicative of patients with less disease progression.

247. On the same call, Defendant Lindborg stated that:

> Although results showed the trial did not reach statistical significance on the primary or secondary endpoints, ***pre-specified and post hoc analyses showed a larger treatment benefit with NurOwn compared to placebo across both primary and secondary outcomes in patients with less advanced disease***. In addition, data indicate NurOwn had an important effect on a wide range of biomarkers from all participants in the trial, ***which were shown to be statistically important to the clinical outcomes observed.***

248. Defendant Lindborg also highlighted the importance of the efficacy subgroup analyses in the Phase 3 Trial, allegedly due to the ALSFRS-R floor effect:

> I want to offer one other comment regarding the importance of these analyses, which might not be obvious. ***It's common to pre-specify subgroup analyses in large trials in the industry. However, in this trial, efficacy subgroup analyses play an important role in the evaluation of NurOwn's treatment effect because of the higher number of participants enrolled in this clinical trial with advanced ALS at baseline, which is a distinguishing feature of this trial, compared to other registration trials.***
>
> Given the insensitivity of the ALSFRS-R to measure disease progression in these study participants, ***analyses of trial participants less likely to be impacted by the ALSFRS-R floor effect are critical to the evaluation of NurOwn's treatment effect.*** Subgroup analyses are one strategy to do this. To reiterate a point made earlier, we believe these corrected analyses reinforce and strengthen the conclusion from NurOwn's Phase 3 trial.
>
> …When we look at these subgroups that have just been published and when we look at any of the subgroups, [they are] what are allowing us to understand the treatment effect from this trial ***once we've minimized the effect of the lower end of the ALSFRS-R floor effect***…

249. Defendant Lindborg further emphasized that the subgroup of Phase 3 Trial participants with ALSFRS-R scores of 35 or above was a "prespecified threshold" which carries "a different level of credence," further stating, in relevant part:

> So in terms of pre-specified and our endpoints, our primary and secondary endpoints, it's always really critical that when we're conducting clinical research and this is true in academia, as well as in the industry that we're thinking very carefully about the trial, the questions we want to answer, and then the appropriate ways to analyze the data and really bring forward evidence. ***So your question about pre-specified analyses is important. These were identified before any data was observed in the trial and they therefore give objectivity and a different level of rigor to being able to draw conclusions from the trial. When we look at subgroups, for example, these are also carefully as we focused on the participants that were 35 or above. This was a pre-specified threshold.***
>
> ***So these analyses carry a different level of credence…***

250. The statements above in the August 15, 2022 press release and investor conference call were materially false and misleading because: (a) the FDA had already told Brainstorm Cell

during the February 16, 2021 meeting that its "floor effect" analysis was misleading and that the Phase 3 Trial's inability to demonstrate efficacy was not the result of any floor effects and the data actually demonstrated that NurOwn has a detrimental effect in the floor effect subgroup, directly contradicting the Individual Defendants' above claim that analyses of Phase 3 Trial participants less likely to be impacted by the floor effect was "critical" to evaluation of "NurOwn's treatment effect" and giving the Individual Defendants no basis on which to assert that the lack of efficacy was due to the subgroup impacted by the floor effect; (b) the subgroup of patients with an ALSFRS-R score of 35 and higher was not prespecified but was rather exploratory, which is a critical distinction given that "pre-specification is the cornerstone of reliable regulatory evidence" and results from post hoc exploratory analysis cannot constitute evidence of effectiveness and therefore are not "objective" or "carrying a different level of credence;" (c) the Phase 3 Trial data was not "stronger" than it was 18 months earlier due to a "correction" because it was all based on post hoc exploratory analyses that the FDA had already invalidated; and (d) the Individual Defendants failed to disclose that the FDA told the Company at the February 16, 2021 meeting that it was concerned about the higher number of deaths among the treatment group.

***August 15, 2022 Buy Rating By Analysts***

251. Reports by analysts published immediately after the Individual Defendants' statements demonstrate that the Individual Defendants were able to deceive even the most sophisticated analysts. On August 15, 2022, analysts Jason McCarthy and Michael Okunewitch at Maxim Group issued a Buy rating stating, in relevant part:

> The company has been continuously analyzing the data from the prior [Phase 3] trial, including the corrected data around the ***prespecified*** analysis of patients with baseline ALSFRS-R score of ≥35 which points to a more robust demonstration of a NurOwn treatment effect. ***This was based on corrections made the [Phase 3] data publication…The emerging data from the P3 for NurOwn and the announcement of a planned BLA filing are positive for BCLI."*** [while the changes

> to the data are small] "they push some key secondary measures to [statistically significant] and are clinically important…the results of the proper statistical analysis further support that there seems to be therapeutic benefit for NurOwn in patient with less severe disease particularly for those that fall into ALSFRS-R baseline scores of 35-43. While the changes are small, they are much bigger in our view, when one considers that it pushed the ***key pre-specified measure*** for patients with ALSFRS-R score of at least 35 to [statistically significant]. ***This will also be important for the BLA which is in the process of being finalized for submission***.

252. Similarly, Analyst David Burke from Zachs, issued a report on August 17, 2022, giving Brainstorm Cell a stock valuation of $21 per share, which was over six times higher than the trading price of $3.44 per share on that same day, based upon "new clinical analyses of Phase 3 Data."

***November 8, 2022 RTF Letter***

253. The FDA issued the RTF letter to Brainstorm Cell on November 8, 2022. The RTF Letter from the FDA "detailed all the deficiencies in the BLA submission and provided the FDA's recommendations on how to resolve the deficiencies." In the RTF letter, the FDA informed the Company, among other things, that the BLA submission was "***scientifically incomplete to demonstrate substantial evidence of effectiveness, and that the manufacturing information was grossly deficient to ensure product quality***… Examples of critical information not provided in the BLA submission include missing or inadequate control materials, validation of methods missing or incomplete, lack of data demonstrating manufacturing consistency, control strategy for prefilled syringe not provided, inadequate testing and facility information, and facilities not ready for inspection."

***November 10, 2022 Press Release***

254. On November 10, 2022, Brainstorm Cell issued a press release titled "BrainStorm Cell Therapeutics Receives Refusal to File Letter from FDA for its New Biologics License Application for NurOwn for the treatment of ALS." This press release informed investors of the

RTF. The Individual Defendants did not disclose the contents of the RTF, only stating that the RTF "included *one item* related to the trial not meeting the standard for substantial evidence of effectiveness and [CMC] related items."

***November 14, 2022 Press Release***

255. On November 14, 2022, before the market opened, Brainstorm Cell issued a press release on Form 8-K with the SEC. The press release announced the Company's request for a Type A meeting with the FDA to "facilitated NurOwn's advancement following receipt of a refusal to file letter regarding the Company's new [BLA]." The press release downplayed the RTF, quoting Defendant Lebovits as stating, "our commitment to ALS patients and our belief in NurOwn's potential to address with unmet medical needs remains unchanged despite our receipt of a refusal to file letter regarding out new [BLA]." The press release also highlighted additional analyses allegedly showing that "***after controlling for the impact of the ALSFRS-R floor effect, participants treated with NurOwn had a higher rate of clinical response and less function lost across 28 weeks compared to placebo***."

256. On an investor conference call the same day, Defendant Lebovits stated, "***so the CMC issues are more trivial issues, it's not really costly. It's asking me some questions about some validation, some others, some are already in the BLA, and we have to point out where it is. Some where we anticipate most of the questions, we receive them as review questions. We don't see outside of the clinical comments any red flags***."

257. The statements made by the Individual Defendants in the November 14, 2022 press release and investor conference call were false and materially false and misleading because: (a) the FDA had already invalidated Brainstorm Cell's "floor effect" hypothesis which was based on misleading, post hoc analysis, as set forth above; (b) the CMA issues were not "trivial," and

instead, the FDA informed the Company in the RTF that manufacturing was "grossly deficient" and "critical information" was left out; and (c) the FDA had raised other "red flags," namely there were over three times the number of deaths in the Phase 3 Trial's treatment group compared to placebo and more adverse events which raised serious safety concerns.

***2022 Proxy Statement***

258. On December 13, 2022, Brainstorm Cell filed the 2022 Proxy Statement with the SEC. Defendants Almenoff, Arbel, Bairu, Frenkel, Polverino, Taub, and Yablonka solicited the 2022 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

259. The 2022 Proxy Statement called for shareholder approval of, *inter alia*: (1) the reelection of Defendants Almenoff, Arbel, Bairu, Frenkel, Polverino, Taub, and Yablonka to the Board; and (2) the ratification of the appointment of Brightman Almagor Zohar & Co., a firm in the Deloitte Global Network, as the independent registered public accounting firm of the Company for fiscal year 2023.

260. With respect to the Company's Risk Management and Oversight Process, the 2022 Proxy Statement stated the following:

> The Board takes an active role, as a whole and at the committee level, in overseeing management of our Company's risks. Generally, the entire Board, the Audit Committee and the GNC Committee are involved in overseeing risks associated with the Company and monitor and assess those risks in reviews with management and with the Company's outside advisors and independent registered public accounting firm. The Audit Committee reviews regulatory risk, operational risk and enterprise risk, particularly as they relate to financial reporting, on a regular basis with management, the Company's independent registered public accounting firm and the Company's outside consultants and advisors. In its regular meetings, the Audit Committee discusses the scope and plan for the internal audit and includes management in its review of accounting and financial controls, assessment of business risks and legal and ethical compliance programs. The GNC Committee monitors the Company's governance and succession risk by review with management and outside

> advisors. The GNC Committee also monitors CEO succession and the Company's compensation policies and related risks by reviews with management. The GNC Committee periodically reviews our compensation programs for employees to assure that these programs do not create risks that are reasonably likely to have a material adverse effect on the company.

261. Regarding the Code of Ethics, the 2022 Proxy Statement noted that the Audit Committee was responsible for "coordinating the Board's oversight of the Company's internal control over financial reporting, disclosure controls and procedures and code of conduct[.]"

262. The 2022 Proxy Statement was materially false and misleading because it failed to disclose that, contrary to the 2022 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing and/or permitting the Company to issue false and misleading statements, and were not complying with the Code of Ethics.

263. The 2022 Proxy Statement also failed to disclose, *inter alia,* that: (a) the FDA had already invalidated Brainstorm Cell's "floor effect" hypothesis which was based on misleading, post hoc analysis, as set forth above; (b) the CMA issues were not "trivial," and instead, the FDA informed the Company in the RTF that manufacturing was "grossly deficient" and "critical information" was left out; (c) the FDA had raised other "red flags," namely there were over three times the number of deaths in the Phase 3 Trial's treatment group compared to placebo and more adverse events which raised serious safety concerns; and (d) as a result of the foregoing, the Individual Defendants' statements about Brainstorm Cell's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

264. As a result of Defendants Almenoff, Arbel, Bairu, Frenkel, Polverino, Taub, and Yablonka causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to re-elect each of them to the Board, thus allowing them to continue breaching

their fiduciary duties to the Company.

***March 27, 2023 Press Release***

265. On March 27, 2023, Brainstorm Cell issued a press release informing investors that it filed the BLA using the "file over protest" procedure and also "filed an amendment to the BLA which responds to most of the outstanding questions the FDA has posed." In an article that was released the same day on Pink Sheet, an online publication, Defendant Lindborg stated, "[w]e have a well-conducted Phase III trial that really, by almost every standard, has operated exactly as planned… Randomization was very effective. We have a very high completion rate. ***We have fewer deaths than we expected. We have a very strong safety profile***."

266. In the same article, Defendant Lindborg was also quoted as touting the results from the allegedly "prespecified group," stating "[w]hen the company looked at a prespecified group of patients with less disease activity at baseline (ASLFRS-R ≥35*), **there was a large treatment effect across all endpoints with NurOwn compared to placebo, and a statistically significant difference on a key endpoint, the average change from baseline**."*

267. The above statements were materially false and misleading by failing to disclose information necessary to make the statements not misleading because Defendant Lindborg knew or recklessly disregarded to disclose that: (a) NurOwn did not have a strong safety profile, given the larger number of deaths in the Phase 3 Trial's treatment group, which the FDA had expressed concern about; (b) the subgroup of patients with ALSFRS-R scores of 35 and over was not prespecified; (c) the FDA had already told the Company that the "key endpoint" "average change from baseline" was of unclear clinical significant; and (d) the amendment to the BLA was missing a large amount of manufacturing information and product data, which, "ha[d] yet to be resolved."

***March 27, 2023 Business Update Call***

268. Also on March 27, 2023, Brainstorm Cell held a "Business Update Call" with investors to give the investors a "high-level overview" of the timeline leading to Brainstorm Cell's decision to file the BLA over protest. Defenant Lindborg discussed Brainstorm Cell's January 11, 2023 Type A meeting with the FDA. Defendant Lindborg stated that the FDA presented the Company with "multiple options to return the BLA to regulatory review" and also that the decision to file the BLA over protest allowed Brainstorm Cell to "reach an AdComm in the shortest amount of time," and also "***enabled [the Company] to respond to matters identified by the FDA in its refusal to file letter, through amendments to the existing BLA*** without having to withdraw and resubmit the application, which would have taken many months. ***So in other words, there was no downside utilizing the File Over Protest pathway,*** while any other pathway would have lengthened the timelines and Ad Comm and PDUFA date."

269. During the call, Defendant Lindborg stated that the Phase 3 Trial's failure to reach its primary endpoint was "***very likely driven by participants who entered the trial with advanced ALS, who fell victim to the floor effect of the ALS functional rating scale***." In discussing Phase 3 Trial participants with baseline ALSFRS-R scores of 35 or above, Defendant Lindborg stated that in a "***a pre-specified subgroup with less advanced ALS, for the primary and secondary endpoints as specified in the protocol and analysis plan***….there was a larger treatment effect across all endpoints with NurOwn compared to placebo with the statistically significant difference observed on a key endpoint for change from baseline in the ALSFRS-R to week 28 with a p-value of 0.05."

270. Additionally, in discussing the "floor effect" subgroup analysis, Defendant Lindborg stated, in relevant part:

> I think that will become clear at the advisory committee meeting. We've presented clearly as we can and I think very objectively when you take data points on a, the gold standard scale, the ALS functional rating scale that goes back to zero, the baseline. It's pretty objective to say that we can't measure ongoing decline on these items and as you have an accumulation of this, it creates a problem, *the FDA certainly has seen this data and clearly and has not disagreed with the statements we've made.*

***March 30, 2023 Press Release***

271. On March 30, 2023, before the market opened, Brainstorm Cell issued a press release reminding investors about the upcoming FDA Advisory Committee Meeting. The press release continued to tout NurOwn's effectiveness, stating the following, in relevant part:

> "Our priority in 2023 is to advance NurOwn® through the regulatory process as expeditiously as possible, including making preparations for our upcoming Advisory Committee Meeting," said BrainStorm's President and Chief Executive Officer (CEO) Chaim Lebovits and Co-CEO Dr. Stacy Lindborg in a joint statement. "The ADCOM will provide an invaluable opportunity for an open and thoughtful discussion among BrainStorm, regulators, ALS experts, and other key stakeholders on both the urgent need for new ALS therapies and the robust and intricate dataset that we believe supports NurOwn's approval. As we move towards this important event, our clinical trial results and experienced team give us confidence in our ability to secure a successful outcome and execute on our mission of improving the lives of individuals with ALS."
>
> **Fourth Quarter 2022 and Recent Highlights**
>
> U.S. Food and Drug Administration (FDA) notified BrainStorm in a written communication that the Agency will hold an Advisory Committee Meeting (ADCOM) to review the company's Biologics License Application (BLA) for NurOwn for the treatment of amyotrophic lateral sclerosis (ALS).
>
> - To meet its goal of proceeding to an ADCOM as expeditiously as posible, BrainStorm utilized the FDA's File Over protest procedure to return the BLA to active review and filed an amendment which responds to most of the outstanding questions previously posed by the FDA. The Agency notified Brainstorm that it will set a date for the ADCOM as well as a Prescription Drug User Fee Act (PDUFA) target action date in due course.
>
> - A presentation at the 2023 MDA Clinical and Scientific Conference delivered by Dr. Lindborg featured post hoc sensitivity analyses from NurOwn's Phase 3 ALS trial. The presentation showed that a floor

effect was observed in the PRO-ACT database, and a pattern of a plateau in ALSFRS-R total score was accompanied by scale items of 0 suggesting measurement challenges in those with advanced ALS due to the floor effect of the ALSFRS-R in the NurOwn phase 3 trial and historical studies which are included in the PRO-ACT database. Analyses conducted in participants not impacted by the floor effect at baseline of the NurOwn phase 3 trial revealed statistically significant, clinically meaningful effects with NurOwn on the primary and key secondary endpoints.

- Additional analyses from the Phase 3 trial of NurOwn in ALS were featured in a presentation at the 21st Annual NEALS Meeting. ***These analyses further strengthened the body of evidence supporting a clinically meaningful treatment effect with NurOwn in ALS.*** Two complementary post-hoc sensitivity analysis methods showed that, after controlling for the impact of the ALSFRS-R floor effect, participants treated with NurOwn had a higher rate of clinical response and less function lost across 28 weeks compared to placebo. The presentation was codelivered by Dr. Lindborg and Merit Cudkowicz, MD, MSC, Chief of Neurology at Massachusetts General Hospital, Julieanne Dorn Professor of Neurology at Harvard Medical School, and Director of the Sean M. Healey & AMG Center for ALS at Massachusetts General Hospital.

- Biomarker data from the Phase 3 trial of NurOwn in ALS were featured in a presentation delivered by Dr. Lindborg at the 5th Annual ALS ONE Research Symposium. The data showed NurOwn modulated pathways related to neurodegeneration, neuroinflammation, and neuroprotection, with changes that were consistent regardless of a participant's level of disease progression at baseline. These data provide further evidence of NurOwn's multifaceted mechanism of action and of the importance of accounting for ALSFRS-R floor effects when evaluating clinical endpoints.

- Findings from the Phase 3 trial of NurOwn in ALS, including biomarker data and analyses accounting for the ALSFRS-R floor effect, were presented at the 13th Annual California ALS Research Summit by Dr. Lindborg. ***The presentation demonstrated that NurOwn had significantly better outcomes in analyses controlling for the floor effect. Outcomes that aligned with historical data and power calculations of the trial.***

- Biomarker data from the Phase 2 trial of NurOwn in progressive multiple sclerosis were presented at the 38th Congress of the European Committee for Treatment and Research in Multiple Sclerosis (ECTRIMS). The data showed robust increases in levels of

> neuroprotective biomarkers in cerebrospinal fluid with NurOwn treatment, thereby providing important biological context for clinical outcome data showing large, clinically meaningful improvements in some trial participants, as defined by response criteria, across all endpoints measured. These observed improvements diverged from what was seen in matched patients with progressive MS from the Comprehensive Longitudinal Investigation of Multiple Sclerosis (CLIMB) registry. The presentation was delivered by Jeffrey Cohen, MD, Hazel Prior Hostetler Endowed Chair and Professor of Neurology, Cleveland Clinic Lerner College of Medicine, Director, Experimental Therapeutics, Mellen Center for MS Treatment and Research.

***March 30, 2023 Investor Conference Call***

272. On March 30, 2023, the Company held its Fourth Quarter 2022 Earnings Call. During the call Defendants Lebovits and Lindborg again understated the RTF and represented that through an amendment to the BLA, Brainstorm Cell had "conducted much of the work necessary" to respond to and remediate the CMC deficiencies FDA set forth in RTF letter. In discussing the "File Over Protest pathway," Defendant Lebovits stated that, "Despite its name, this mechanism is a standard regulatory procedure and is not inherently antagonistic. In fact, we collaborated constructively with the FDA before the agency provided us with several regulatory options that would reactivate the BLA in order to allow NurOwn to be discussed as an ADCOM."

273. On the same call, while discussing the RTF letter, Defendant Lebovits discussed the Company's plan moving forward, stating, in relevant part:

> ***The RTF letter included one item related to the trial not meeting the standard for substantial evidence of effectiveness*** or the primary endpoint [Indiscernible] statistical significance and the remaining items related to chemistry manufacturing and controls in short CMC. ***Given our exemplary record of high quality manufacturing,*** we have full confidence that will be able to remediate each of these points in a straightforward manner.
>
> ***In fact, we already have conducted much of the necessary work in a short time frame and submitted an amendment to the BLA on March 7, 2023, which responds to the majority of the manufacturing items raised in the letter***. We work to respond to the few remaining manufacturing items is ongoing and would be

> complete in due time. The remaining items RTF letter and the only item related to our clinical data that will be the focus. That will be the key point of the discussion.

274. Defendant Lindborg discussed NurOwn's safety on the call as well, stating, in relevant part:

> We've summarized that very completely, very thoroughly and certainly that will be summarized at our ADCOM. This is a dimension that the physician's closest to our trial, including our Data Safety Monitoring Board, ***have continued to express that there were no safety concerns***, that were existed in the trial or that emerged as a -- from a profile of NurOwn and that safety has been clarified to their complete satisfaction.

***May 15, 2023 Investor Conference Call***

275. On May 15, 2023, Brainstorm Cell held its first quarter of 2023 earnings call. During the call, Defendant Lindborg stated that: "***[a] thorough analysis of NurOwn Phase 3 data show evidence of clinically meaningful effectiveness and we are further encouraged by the strong and consistent biomarker data, which are predictive of clinical response to the trial span pathways and important to ALS***."

276. During the call, Defendant Lindborg further discussed the allegedly pre-specified subgroup of Phase 3 Trial participants that were not impacted by the floor effect and also the biomarker data, stating:

> The process for approval of any BLA will be determined primarily by the body of evidence generated. ***And on this front, we firmly believe that NurOwn's data package is strong enough to support regulatory approval***…As disclosed previously, the Phase 3 trial did not reach statistical significance on the primary and secondary endpoints. ***However, in a pre-specified group of participants with less advanced disease at baseline, there was a clinically meaningful treatment response on the primary and secondary endpoints with NurOwn compared to placebo***. On the secondary endpoint, which was favored by the FDA, the average change from baseline to week 28 and the ALS functional rating scale, the treatment difference was statistically significant at the level of P> 0.05. ***These findings are important as looking at this pre-specified subgroup enabled us to focus on data that is not as impacted by the floor effect in the scale….***
>
> …So in summary, we can objectively show that the ALS functional rating scale was unable to measure ongoing decline in participants with the most advanced ALS

> who were enrolled in the trial, a unique sample of trial participants relative to other approved products. ***Based on the data, I've just walked you through, we have clinical and biomarker data that demonstrate evidence of significantly better outcomes in participants treated with NurOwn***. And we have amassed efficacy and safety data that we believe supports a positive benefit risk evaluation of NurOwn.

***June 6, 2023 Press Release***

277. On June 6, 2023, before the market opened, Brainstorm Cell issued a press release wherein it announced the FDA's plan to meet on September 27, 2023 to review the BLA for NurOwn. The press release continued to promote the effectiveness of NurOwn, stating the following, in relevant part:

> "We are encouraged by the regulatory flexibility that the FDA has shown over the last year in ALS broadly, and with respect to NurOwn in particular, and believe an Advisory Committee meeting is good for patients," said Chaim Lebovits, BrainStorm President & CEO. "We are of course deeply committed to the scientific and regulatory process, which includes continuing research to confirm the results of the NurOwn clinical program and are working with ALS experts in designing a rigorous clinical study to answer important questions about this therapy and inform further research on ALS."
>
> Stacy Lindborg, Ph.D., BrainStorm co-CEO, commented: ***"We welcome the opportunity to present our data at the forthcoming ADCOM. We remain confident in NurOwn and believe our data support regulatory approval***. As is the case with most ALS research, our clinical program generated complex results, which deserve a thoughtful and holistic review by scientists, ALS experts, FDA reviewers, advocates, and patients. We believe this approach honors the needs of those living with ALS and offers the greatest promise for BrainStorm to fulfill our commitment to the ALS community."

***August 14, 2023 Press Release***

278. On August 14, 2023, the Company issued a press release announcing the Company's financial and operating results for the quarter ended June 30, 2023. In the press release, Defendant Lindborg claimed that Brainstorm Cell "recently delivered an important presentation… ***The data from this new analysis showed that treatment with NurOwn significantly elevated markers of neuroprotection and lowered markers of neuroinflammation and***

***neurodegeneration, including neurofilament light (NfL). Reductions in plasma NfL are believed to be a predictor of clinical benefit in ALS."***

279. The August 14, 2023 press release was materially false and misleading because Defendant Lindborg knew or recklessly disregarded, yet failed to disclose that in the Phase 3 Trial, reductions in NfL corresponded with worse clinical outcomes, for example, patients with higher reduction of NfL experienced greater loss of function, which was an entirely unfavorable result, does not support clinical benefit.

***August 14, 2023 Investor Conference Call***

280. During an investor conference call held on August 14, 2023, Defendant Lebovits discussed the upcoming Advisory Committee, stating "***[b]ut when you're able to eliminate the advanced patients, we see both in the primary and secondary endpoints, statistical[ly] significant results. Of course, we're not going to lay it out here. That's what we're going to do at the ADCOM***."

281. The statements identified in ¶¶ 229-231, 237, 245-249, 254-256, 265-266, and 268-280 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (a) the FDA had already invalidated Brainstorm Cell's "floor effect" hypothesis which was based on misleading, post hoc analysis, as set forth above; (b) the CMA issues were not "trivial," and instead, the FDA informed the Company in the RTF that manufacturing was "grossly deficient" and "critical information" was left out; (c) the FDA had raised other "red flags," namely there were over three times the number of deaths in the Phase 3 Trial's treatment group compared to placebo and more adverse events which raised serious safety concerns; and (d) as a result of the foregoing, the Individual Defendants' statements about

Brainstorm Cell's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Emerges**

282. On September 27, 2023, Brainstorm Cell announced the results of the FDA's review of its BLA in a press release. Notably, the Company revealed that members of the Cellular, Tissue, and Gene Therapies Advisory Committee voted 17 to 1 that there was not substantial evidence to show NurOwn's effectiveness. The press release stated the following, in relevant part:

> Today the Committee voted that NurOwn did not demonstrate substantial evidence of effectiveness for treatment of mild to moderate ALS.
>
> "The Committee's vote was a sad outcome for the ALS community, who have too few options to help manage this merciless and deadly disease," said Stacy Lindborg, PhD, co-CEO of BrainStorm. "We firmly believe that the totality of data presented for NurOwn today provide a compelling case for approval, with clinical evidence in those with less advanced disease supported by strong and consistent biomarker data that are predictive of clinical response. We truly did our best to make the NurOwn data clear to the FDA Advisory Committee. Unfortunately, had more time and opportunity been allowed, many remaining questions posed by Advisory Committee members could have been sufficiently addressed."

283. The FDA Briefing Document revealed that the Company had significantly downplayed the risks associated with NurOwn, noting that there was not enough evidence to support NurOwn's effectiveness and that there were large amounts of missing data in the Company's BLA. The document stated the following, in relevant part:

> On initial receipt of the BLA, ***FDA determined that the submission was scientifically incomplete to demonstrate substantial evidence of effectiveness, and that the manufacturing information was grossly deficient to ensure adequate product quality.*** Examples of critical information not provided in the BLA submission include missing or inadequate control of materials, validation of methods missing or incomplete, lack of data demonstrating manufacturing consistency, control strategy for prefilled syringe not provided, inadequate manufacturing and testing facility information, and facilities not ready for inspection.

FDA therefore refused to file the submission and detailed these deficiencies in a Refuse to File (RTF) letter to the Applicant. The Applicant elected to request that the BLA to be filed over protest, and subsequently provided further retrospective analyses and biomarker results.

* * *

(2) Survival in the Phase 3 study was worse at study completion for subjects who received MSC-NTF. A total of 13 deaths occurred during the post-treatment follow up (28 weeks ± 5 days) with 10 deaths (10/95) in the MSC-NTF group and 3 deaths (3/94) in the placebo group. The Kaplan-Meier (KM) estimate of survival at Week 28 (± 5 days) was 88.3% (95% CI: 79.3, 93.6) for the MSC-NTF group and 94.4% (95% CI: 81.2, 98.4) for the placebo group, with a nominal pvalue of 0.04 from unadjusted log rank test.

***This outcome suggests the lack of efficacy of MSC-NTF on survival of patients with ALS.***

(3) The Applicant performed three different retrospective analyses on an unblinded, post-hoc subgroup from the Phase 3 study, excluding in each certain subjects based on the assertion of a "floor effect" in the ALSFRS-R, according to different criteria. A floor effect refers to insensitivity of an outcome measure to differences at the lower end of an assessment scale. In this case, the Applicant claims that a floor effect results in plateauing of ALSFRS-R total scores over time, during which further deterioration of function cannot be measured. ***However, no floor effect was demonstrated in the analyses. In addition, floor effect would not be expected in the assessment of survival or biomarkers. Of note, when assessed by change in ALSFRS-R total score from baseline to Week 28, the MSCNTF subjects ostensibly affected by a "floor effect" in fact experienced a numerically larger decline in function over time than did the corresponding placebo subjects. This result indicates continued deterioration of function and suggests lack of treatment benefit for MSC-NTF subjects.***

(4) In the Phase 3 study, the Applicant collected cerebrospinal fluid (CSF) samples at baseline, Weeks 2, 4, 8, 12, 16, and 20 post-Treatment 1, and examined levels of multiple biomarkers. The Applicant then conducted numerous exploratory analyses, including multiple post hoc analyses, to evaluate the relationships between the selected biomarkers and clinical efficacy outcomes, to support the claim of effectiveness. Of note, there was a large amount of missing data for all biomarkers at Week 20 (~50%), the last time point for biomarker sample collection and the focused time point for biomarker analyses.

* * *

***The Applicant submitted the BLA on September 9, 2022. FDA conducted a filing review and determined that a substantive review could not be performed, because***

***the BLA submission was scientifically incomplete and grossly deficient. Critical clinical and manufacturing deficiencies were identified. For clinical, the completed randomized, placebo-controlled clinical studies failed to show efficacy in their prospectively specified efficacy endpoints to demonstrate required substantial evidence of effectiveness. For manufacturing, the required Chemistry, Manufacturing, and Controls information covering several critical categories was not included in the application, and the level of information included was insufficient to perform a full assessment of product quality. Consequently, FDA issued a refuse-to-file letter to the Applicant on November 8, 2022.***

* * *

***FDA has concerns about the consistency of the manufacturing process and potential sources of product variability. It is important for licensure the Applicant demonstrate the manufacturing process is under a state of control.*** Chemistry, Manufacturing, and Control regulations are intended to assure that all subjects receive a quality product lot, including for safety and potency. Data supporting a product can come from in-process and final product properties, and from clinical data of safety and efficacy. ***However, for this BLA clinical data supporting safety for all patients is unclear, and efficacy has not been demonstrated.***

* * *

In addition to concerns about the adequacy of the existing manufacturing control strategy, there are concerns about manufacturing changes – either those that occurred during clinical development under IND, or for the proposed commercial product.

* * *

The primary efficacy endpoint and all key secondary endpoints failed to demonstrate efficacy of MSC-NTF compared to placebo (see Appendix III).

From the statistical perspective, when the primary efficacy endpoint in a clinical study fails to show statistical significance, the secondary efficacy endpoints cannot be tested with Type I error control. In accordance with the Agency's discussions with the Applicant (Face-to-Face Meeting, November 18, 2019), however, FDA reviewed all primary and key secondary endpoint results. The Agency did so for several reasons: (1) although at that meeting the Applicant expressed openness to changing the primary efficacy endpoint from a slope-based analysis, FDA recommended against doing so, in order to avoid compromising the integrity of the Phase 3 study, which the Applicant had already initiated; (2) data for the outcome measures recommended by the Agency, such as CAFS or survival, were collected by the Applicant as secondary efficacy endpoints; and (3) FDA's willingness to exercise regulatory flexibility and desire to better inform subjects and stakeholders.

Primary Efficacy Endpoint

***For the Applicant's primary efficacy endpoint, the percent of responders in the MSC-NTF group versus the placebo group did not show a statistically significantly difference:*** the MSC-NTF group had 32.6% (31/95) responders and the placebo group had 27.7% (26/94). The odds ratio after adjusting for the predefined covariates was 1.33 (95% CI: 0.63, 2.80) with a p-value of 0.45.

Key Secondary Efficacy Endpoints

***All key secondary efficacy endpoints failed to show efficacy of MSC-NTF.*** For example, the least squares (LS) mean CAFS scores at Week 28 did not differ significantly between subjects in the MSC-NTF group and those in the placebo group (3.0: 96.5 versus 93.5; 95% CI: -11.4, 17.4; nominal p-value:17 0.68). Similarly, there was minimal difference in LS mean change from baseline to Week 28 in ALSFRS-R total score (0.4: –5.5 versus –5.9; 95% CI: -1.47, 2.20; nominal p-value: 0.69).

* * *

In addition to this analysis, at the Type A meeting with the FDA after refusal to file of the BLA, the Applicant presented a third post-hoc floor effect analysis in which the no floor effect subgroup was defined as ALSFRS-R Item Level had no value 0 at baseline (Definition 3).

We will refer to these subgroups identified by the Applicant collectively as "no floor effect subgroup" and their respective complement "floor effect subgroup." In the "no floor effect subgroup" identified by different definitions, some of the clinical endpoints showed "statistical significance" per the Applicant (Appendix IV); however, ***FDA believes these findings from the exploratory subgroup analysis can only be used for hypothesis generation, not as evidence of effectiveness to support approval, for the following reasons:***

> (1) Post-hoc subgroup analyses in general have high risk of finding false positive results due to lack of control for multiple hypothesis testing and potential confounding due to imbalance in the measured/unmeasured baseline prognostic factors brought about by breaking the randomization. What is particularly concerning in this case is that there is no solid definition for the "no floor effect subgroup" (i.e., subgroup of trial subjects not impacted by floor effect). The "no floor effect subgroup" can potentially be defined in many ways, as illustrated by the three distinct subgroups identified by the Applicant, with various sample sizes (145, 159, and 106 subjects respectively). As one could define "no floor effect subgroup" in many ways, some of the "no floor effect subgroup" (like the three selected by the Applicant) may happen to show "positive" findings (i.e., findings that seem to suggest clinical efficacy) among many other subgroups that

may show “negative” findings (i.e., findings that seem to suggest harm). These findings could be due to random chance, given the potentially large number of subgroups the Applicant could examine. Therefore, these findings need to be confirmed by additional adequate and well-controlled clinical study(ies) to establish their validity; these findings cannot be used as evidence of effectiveness to meet the statutory standard for this BLA.

(2) MSC-NTF appeared to have a detrimental effect in the floor effect subgroups (Appendix IV). For example, the placebo group had a better CAFS ranking than the MSC-NTF group with a nominal p-value of 0.026 in the floor effect subgroup defined by ALSFRS-R Total Score baseline ≤25 (Definition 1). The floor effect subgroups defined by the other two methods had the same issue. This is not surprising; given that the overall treatment effect was close to zero, when one subgroup happens to show a strong positive treatment effect, the complementary subgroup is highly likely to have a strong negative effect. The “negative” findings in the floor effect subgroup thus may well be false “negative,” in the same way that the “positive” findings in the no floor effect subgroup may well be false positives.

(3) FDA did not observe a “floor effect” in the floor effect subgroup defined by any of the three definitions identified by the Applicant. If there were a “floor effect” in the Applicant-identified floor effect subgroup, the ALSFRS-R total score post baseline would have been bounded by a “floor,” which would have prevented the score from much further decline. This is in direct contrast with the fact that the MSC-NTF “floor effect subgroup” had a drastically steeper decline in ALSFRS-R total score from baseline compared with the no floor effect subgroup or the placebo floor effect subgroup. At the same time, the magnitude of change between the placebo floor effect subgroup and the placebo no floor effect subgroup were comparable, which further puts into question the validity of the “floor effect” (Figure 12 [using Definition 1] and Figure 14 [using Definition 3]). In addition, the MSC-NTF floor effect subgroup showed substantially worse CAFS ranking than the no floor effect subgroups while the two placebo subgroups were comparable Figure 13. In conclusion, the lack of efficacy of MSC-NTF over placebo cannot be explained by a floor effect.

* * *

The Applicant conducted exploratory subgroup analysis of “rapid progressors” versus “slow progressors.” The Applicant defined “rapid progressors” as subjects with ≥2 points decline from screening to baseline (~3 months) in the ALSFRS-R total score; correspondingly, “slow progressors” were defined as subjects with <2 points decline from screening to baseline in ALSFRS-R total score. As FDA stated in the November 18, 2019, Type C Meeting Summary:

"***We interpret your Phase 2 data as evidence that your product is not effective in the treatment of ALS. Your proposal that your Phase 2 data suggest benefit for the 'rapid progressors' is most likely overinterpretation of your subgroup analyses.*** In subgroup analyses, the results for the 'slow progressors' could be interpreted to suggest that your product is harmful to some patients with ALS. However, such subgroup results, for both the 'rapid progressors' and the 'slow progressors', are most likely spurious and misleading, as is often the case for such subgroup analyses. We note that it is not clear why a product that you propose to have neuroprotective and immunomodulatory effects would be beneficial for some patients with ALS and harmful to other patients with ALS. Due to their inconsistency (i.e., opposite effects in 'rapid progressors' versus 'slow progressors'), and the unclear biological plausibility for such inconsistency, your subgroup results do not support that your product has any meaningful activity in the treatment of ALS" [].

Despite FDA's consistent concern about the definition of "rapid progressors," and the exploratory nature of the subgroup findings, the Applicant decided to enroll only "rapid progressors" in the Phase 3 study. For that study, the Applicant modified the definition of a "rapid progressor" to be subjects who experienced at least a 1.0-point decline in ALSFRS-R per month, on average, during the 3-month pretreatment period.

* * *

***In Study BCT-002-US, the biomarker analyses were limited by the large amount of missing data. Biomarker data were only collected up to Week 20, but the efficacy data were collected up to Week 28. At Week 20, the key biomarkers that the Applicant identified, NfL, galectin-1, MCP-1, VEGF-A, and LAP, had up to approximately 50% missing data.*** In general, this degree of missing data compromises the validity of the analyses and could lead to over-estimation of the correlations between the biomarkers and efficacy endpoints. This missing data problem was further exacerbated when those post-hoc subgroup analyses were conducted based on different "floor effect" hypothesis.

Although the Applicant added the biomarker addendum to the statistical analysis plan before the data were unblinded, numerous biomarker analyses were proposed without multiplicity adjustment or formal hypothesis testing. The results from those biomarker analyses can only be considered as exploratory because there was no overall Type I error rate control, and any nominal "statistical significance" claim (nominal $p \leq 0.05$) could be due to chance alone.

Additionally, the applicant conducted multiple post-hoc analyses after the data were unblinded. These post-hoc analyses could be biased as the data

> are unblinded and analyses can be made to produce a more favorable result. Thus, post-hoc analyses in general have a high chance of false positive findings.
>
> ***In summary, FDA does not believe there is sufficient evidence to support that any of the assessed biomarkers is reasonably likely to predict clinical benefit. Considering the potential mechanism of action of MSC-NTF, which may involve multiple pathways, it is challenging to use biomarker data to support effectiveness of MSC-NTF based on exploratory analyses of multiple biomarkers. There were also large amounts of missing data.*** In the case of NfL, which is released into the CSF by damaged or degenerating axons, higher reduction from baseline at Week 20 of CSF NfL levels were seen in subjects with poorer efficacy outcome (measured by ALSFRS-R score changes from baseline at Week 28), the opposite of what would be expected. These findings could be due to 50% of missing NfL data at Week 20 and relatively overall small changes in NfL in MSC-NTF group. Either way in the setting of negative phase 3 study results, the findings related to NfL do not appear to provide direct evidence on treatment effect through changes in NfL.
>
> *  *  *
>
> 6.2 Safety Summary
>
> (1) The higher incidence of deaths in the MSC-NTF group which indicates lack of survival benefit of MSC-NTF and warrants further investigation.
>
> (2) There appears to be a higher incidence of respiratory failure and dysphagia in the MSC-NTF group.
>
> (3) There appears to be a higher incidence of pain (e.g., coccydynia and back pain) in the MSC-NTF group.

284. Also on September 27, 2023, *Reuters* published an article titled "US FDA panel votes against BrainStorm's ALS therapy over effectiveness concern," wherein it summarized the FDA's decision and stated the following, in relevant part:

> ***The U.S. Food and Drug Administration's (FDA) staff reviewers said on Monday there is not enough evidence to support NurOwn's effectiveness and that there are large amounts of missing data in the company's application.***
>
> "Providing false hope can be ethically problematic and false hope is provided when the probability of a positive outcome is overestimated. And I think that seems to be the case here," said Lisa Lee, one of the panelists.

285. On this news, Brainstorm Cell's share price fell $0.19 per share, or 48.72%, from a closing price of $0.39 per share on September 27, 2023 to close at $0.20 per share on September 28, 2023.

**SUBSEQUENT DEVELOPMENTS**

286. On April 16, 2024, the Company announced that Defendant Lindborg would resign from her role as Co-CEO on May 9, 2024. It was further announced that upon her resignation, Defendant Lindborg would join the Board.

**THE INDIVIDUAL DEFENDANTS' KNOWLEDGE**

287. [redacted]

288. [redacted]

289. [redacted]

[redacted]

290. [redacted]

291. [redacted]

292. [redacted]

293. [redacted]

[redacted]

294. [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

295. [redacted]

296. [redacted]

[redacted]

297. [redacted]

298. [redacted]

299. [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

300. [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

301. [redacted]

302. [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

303. [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted]

304. [redacted]

[redacted]

305. [redacted]

306. [redacted]

- [redacted]

- [redacted]
  - [redacted]
  - [redacted]
- [redacted]

[redacted]

## DAMAGES TO BRAINSTORM CELL

307. As a direct and proximate result of the Individual Defendants' conduct, Brainstorm Cell has lost and expended, and will continue to lose and expend, many millions of dollars.

308. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

309. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

310. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

311. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

312. As a direct and proximate result of the Individual Defendants' conduct, Brainstorm Cell has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

**DERIVATIVE ALLEGATIONS**

313. Plaintiffs bring this action derivatively and for the benefit of Brainstorm Cell to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Brainstorm Cell, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

314. Brainstorm Cell is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

315. Plaintiffs are, and has been at all relevant times, a shareholder of Brainstorm Cell. Plaintiffs will adequately and fairly represent the interests of Brainstorm Cell in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

**DEMAND FUTILITY ALLEGATIONS**

316. Plaintiffs incorporate by reference and reallege each and every allegation stated above as if fully set forth herein.

317. A pre-suit demand on the Board of Brainstorm Cell is futile and, therefore, excused. At the time of filing of this Amended Consolidated Complaint, the Board consists of the following seven individuals: Defendants Arbel, Bairu, Lindborg, Polverino, Yablonka, and Naor (the "Current Director Defendants"), and non-party Peter Pitts ("Pitts," and with the Current Director Defendants, the "Current Directors"). Plaintiffs need only to allege demand futility as to four of the seven Current Director Defendants who are on the Board at the time of the filing of this Amended Consolidated Complaint.

318. Demand is excused as to all of the Current Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Current Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

319. Moreover, each of the Current Director Defendants other than Defendants Naor and Lindborg solicited the 2021 and 2022 Proxy Statements to call for a shareholder vote to, *inter alia*, re-elect themselves to the Board, thus allowing them to continue breaching their fiduciary duties to the Company.

320. In complete abdication of their fiduciary duties, the Current Director Defendants either knowingly or recklessly caused or permitted Brainstorm Cell to issue materially false and misleading statements. Specifically, the Current Director Defendants caused the Company to issue false and misleading statements which were intended to make the Company appear more profitable and attractive to investors. Moreover, the Current Director Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Current Director Defendants

breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

321. Additional reasons that demand on non-party Pitts is futile follow. Pitts is neither disinterested nor independent, and therefore, is incapable of considering a demand on the Board to take action against wrongdoers for the wrongdoing alleged herein because he, as the Company's Executive Chairman and Chief Strategic Regulatory Officer, is an employee of the Company, and thus derives substantially all of his income from his employment with Brainstorm Cell, thereby rendering him not independent. As such, Pitts could not objectively and disinterestedly consider a demand to sue the Individual Defendants, and any such demand upon Pitts is therefore futile.

322. Additional reasons that demand as to Defendant Lindborg is futile follow. Defendant Lindborg has served as a Company director since May 2024. Defendant Lindborg previously served as the Company's Co-CEO from January 2023 until May 2024. Prior to this, Defendant Lindborg served as the Company's Executive Vice President and Chief Development Officer from June 2020 to January 2023. The Company previously provided Defendant Lindborg with her primary occupation, for which she received handsome compensation. Thus, as the Company admits, she is not an independent director. As a trusted Company director and the Company's former Co-CEO, Defendant Lindborg conducted little, if any, oversight of the scheme to cause Brainstorm Cell to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, Defendant Lindborg failed to correct and personally made many of the false and misleading statements alleged herein. Moreover, Defendant Lindborg is named a defendant in the Securities Class Action. As a result, Defendant Lindborg breached her fiduciary duties, faces a substantial

likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Lindborg is futile and excused.

323. Additional reasons that demand as to Defendant Arbel is futile follow. Defendant Arbel co-founded the Company and has served as a Company director since May 2004. She also serves as the Vice-Chairperson of the Board, as the Chair of the Governance, Nominating and Compensation Committee, and as a member of the Audit Committee. Moreover, Defendant Arbel solicited the 2021 Proxy Statement and 2022 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of Defendants Arbel, Almenoff, Frenkel, Polverino, Taub, Yablonka, and Bairu, allowing them to continue to breach their fiduciary duties to the Company. As the Company's trusted Vice-Chairperson, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As a result, Defendant Arbel breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Arbel is futile and excused.

324. Additional reasons that demand as to Defendant Bairu is futile follow. Defendant Bairu has served as Company director since October 2021. Defendant Bairu has received and continues to receive compensation for his role as a director as described above. Moreover, Defendant Bairu solicited the 2021 Proxy Statement and 2022 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of Defendants Arbel, Almenoff, Frenkel, Polverino, Taub, Yablonka, and Bairu, allowing them to continue to breach their fiduciary duties to the Company. As a trusted Company director, Defendant Bairu conducted little, if any, oversight of the scheme to cause Brainstorm Cell to make false and

misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Bairu breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Bairu is futile and excused.

325. Additional reasons that demand as to Defendant Polverino is futile follow. Defendant Polverino has served as Company director since February 2018. He also serves as a member of the Governance, Nominating and Compensation Committee. In addition, he has received and continues to receive compensation for his role as a director as described above. Moreover, Defendant Polverino solicited the 2021 Proxy Statement and 2022 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of Defendants Arbel, Almenoff, Frenkel, Polverino, Taub, Yablonka, and Bairu, allowing them to continue to breach their fiduciary duties to the Company. As a trusted Company director, Defendant Polverino conducted little, if any, oversight of the scheme to cause Brainstorm Cell to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Polverino breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Polverino is futile and excused.

326. Additional reasons that demand as to Defendant Yablonka is futile follow. Defendant Yablonka has served as a Company director since June 2014 and as the Company's Executive Vice President, Chief Business Officer since March 6, 2017. The Company provides Defendant Yablonka with his primary occupation for which he receives handsome compensation.

Thus, as the Company admits, he is a non-independent director. Moreover, Defendant Yablonka solicited the 2021 Proxy Statement and 2022 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of Defendants Arbel, Almenoff, Frenkel, Polverino, Taub, Yablonka, and Bairu, allowing them to continue to breach their fiduciary duties to the Company. As a trusted Company director, Defendant Yablonka conducted little, if any, oversight of the scheme to cause Brainstorm Cell to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Yablonka breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Yablonka is futile and excused.

327. Additional reasons that demand as to Defendant Naor is futile follow. Defendant Naor has served as a Company director since June 2023. He also serves as Chair of the Audit Committee and as a member of the Governance, Nominating and Compensation Committee. As a trusted Company director, Defendant Naor conducted little, if any, oversight of the scheme to cause Brainstorm Cell to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Naor breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Naor is futile and excused.

328. In the event the Court determines that demand futility should be analyzed with respect to the membership of the Company's Board on March 21, 2024 (the "Initial Board"), the

date that the first of the pre-consolidation cases were initiated, demand would nonetheless be excused as futile.[7]

329. A pre-suit demand on the Initial Board is futile and therefore, excused. At the time of filing on March 21, 2024, the Initial Board consisted of the following seven individuals: Defendants Arbel, Bairu, Frenkel, Polverino, Yablonka, Almenoff, and Naor (with the Current Director Defendants, the "Director Defendants." The Director Defendants and Current Directors, together, are the "Directors"). Plaintiffs only need to allege demand futility as to four of the seven Director Defendants that were on the Initial Board.

330. Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

331. Moreover, each of the Director Defendants other than Defendant Naor solicited the 2021 and 2022 Proxy Statements to call for a shareholder vote to, *inter alia*, re-elect themselves to the Board, thus allowing them to continue breaching their fiduciary duties to the Company.

332. In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly caused or permitted Brainstorm Cell to issue materially false and misleading statements. Specifically, the Director Defendants caused the Company to issue false and misleading statements which were intended to make the Company appear more profitable and

[7] Demand futility is examined with respect to the membership of the Board at the time the amended consolidated complaint is filed unless the asserted terms are "validly in litigation" at the time of the original complaint. *Braddock v Zimmerman*, 906 A.2d 776, 778-79 (Del. 2006).

attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

333. Additional reasons that demand as to Defendant Frenkel is futile follow. Defendant Frenkel served as a Company director and Chairperson from March 2020 until July 24, 2026. He received compensation for his role as a director as described above. Moreover, Defendant Frenkel solicited the 2021 Proxy Statement and 2022 Proxy Statement, both of which contained material misrepresentations and omissions that led to the re-election of Defendants Arbel, Almenoff, Frenkel, Polverino, Taub, Yablonka, and Bairu, allowing them to continue to breach their fiduciary duties to the Company. As a trusted Company director, Defendant Frenkel conducted little, if any, oversight of the scheme to cause Brainstorm Cell to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a result, Defendant Frenkel breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Frenkel is futile and excused.

334. Additional reasons that demand as to Defendant Almenoff is futile follow. Defendant Almenoff served as a Company director from February 26, 2017 until December 2023. Defendant Almenoff also served on the Audit Committee until December 2023. In addition, she received compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over

reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As a result, Defendant Almenoff breached her fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested. Thus, demand upon Defendant Almenoff is futile and excused.

335. Additional reasons that demand on the Board is futile follow.

336. [redacted]

[redacted]

337. Defendant Arbel, Almenoff and Naor (the "Audit Committee Defendants") served as a member of the Company's Audit Committee during the Relevant Period. They violated the Audit Committee Charter by failing to adequately exercise their risk management and risk assessment functions and failing to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics. Thus, the Audit Committee Defendants breached their fiduciary duties and are not disinterested. Therefore, demand is further excused and futile as to them.

338. [redacted]

339. In violation of the Code of Ethics, the Director Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Ethics by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Ethics and the law. Thus, the Director Defendants breached the Company's own Code of Ethics, are not disinterested, and demand is excused as to them.

340. Brainstorm Cell has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Brainstorm Cell any part of the damages Brainstorm Cell suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

341. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

342. The acts complained of herein constitute violations of fiduciary duties owed by Brainstorm Cell's officers and directors, and these acts are incapable of ratification.

343. The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Brainstorm Cell. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Brainstorm Cell, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

344. If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Brainstorm Cell to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

345. Thus, for all of the reasons set forth above, all of the Current Director Defendants, and, if not all of them, at least four of the Current Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

346. Similarly, for all of the reasons set forth above, and if the Court so chooses, all of the Director Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Defendants Arbel, Almenoff, Frenkel, Polverino, Taub, Yablonka, and Bairu for Violations of Section 14(a) of the Exchange Act

347. Plaintiffs incorporate by reference and realleges each and every allegation set forth above, as though fully set forth herein.

348. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

349. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

350. Under the direction and watch of Defendants Arbel, Almenoff, Frenkel, Polverino, Taub, Yablonka, and Bairu, the 2021 Proxy Statement failed to disclose that, contrary to the 2021 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's

responsibilities, the Board and its committees were not adequately exercising these functions, were causing and/or permitting the Company to issue false and misleading statements, and were not complying with the Code of Ethics.

351. The 2021 Proxy Statement also failed to disclose that: (a) the subgroup of patients with an ALSFRS-R score of 35 and above was not prespecified but was instead exploratory, a critical distinction given that "prespecification is the cornerstone of reliable regulatory evidence" and results from post hod exploratory analysis cannot constitute evidence of effectiveness; (b) the FDA told the Company at the November 18, 2019 meeting that the Company should not only enroll rapid progressors in the Phase 3 Trial and also that subgroup results were misleading and therefore would not be sufficient to support FDA approval; and (c) the Phase 3 Trial's allegedly positive biomarker data corresponded with worse clinical outcomes, as patients with higher reduction of NfL experienced greater loss of function, which was an entirely unfavorable result that does not support clinical benefit.

352. Under the direction and watch of Defendants Almenoff, Arbel, Bairu, Frenkel, Polverino, Taub, and Yablonka, the 2022 Proxy Statement failed to disclose that, contrary to the 2022 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing and/or permitting the Company to issue false and misleading statements, and were not complying with the Code of Ethics.

353. The 2022 Proxy Statement also failed to disclose that: (a) the FDA had already invalidated Brainstorm Cell's "floor effect" hypothesis which was based on misleading, post hoc analysis, as set forth above; (b) the CMA issues were not "trivial," and instead, the FDA informed the Company in the RTF that manufacturing was "grossly deficient" and "critical information"

was left out; (c) the FDA had raised other "red flags," namely there were over three times the number of deaths in the Phase 3 Trial's treatment group compared to placebo and more adverse events which raised serious safety concerns**;** and (d) as a result of the foregoing, the Individual Defendants' statements about Brainstorm Cell's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

354. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 and 2022 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the 2021 and 2022 Proxy Statements, including but not limited to, the election of Defendants Arbel, Almenoff, Frenkel, Polverino, Taub, Yablonka, and Bairu to the Board.

355. The false and misleading elements of the 2021 and 2022 Proxy Statements led to, among other things, the election of Defendants Arbel, Almenoff, Frenkel, Polverino, Taub, Yablonka, and Bairu, which allowed them to continue to breach their fiduciary duties to Brainstorm Cell.

356. The Company was damaged as a result of Defendants Arbel, Almenoff, Frenkel, Polverino, Taub, Yablonka, and Bairu's material misrepresentations and omissions in the 2021 and 2022 Proxy Statements.

357. Plaintiffs, on behalf of Brainstorm Cell, have no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

358. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

359. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Brainstorm Cell's business and affairs.

360. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

361. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Brainstorm Cell.

362. In breach of their fiduciary duties owed to Brainstorm Cell, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (a) the FDA had already invalidated Brainstorm Cell's "floor effect" hypothesis which was based on misleading, post hoc analysis, as set forth above; (b) the CMA issues were not "trivial," and instead, the FDA informed the Company in the RTF that manufacturing was "grossly deficient" and "critical information" was left out; (c) the FDA had raised other "red flags," namely there were over three times the number of deaths in the Phase 3 Trial's treatment group compared to placebo and more adverse events which raised serious safety concerns**;** and (d) as a result of the foregoing, the Individual Defendants' statements about Brainstorm Cell's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

363. The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, thus rendering them personally liable to the Company for breaching their fiduciary duties.

364. Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

365. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

366. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Brainstorm Cell's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

367. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

368. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Brainstorm Cell has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

369. Plaintiffs, on behalf of Brainstorm Cell, have no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Unjust Enrichment

370. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

371. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Brainstorm Cell.

372. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Brainstorm Cell that was tied to the performance or artificially inflated valuation of Brainstorm Cell, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

373. Plaintiffs, as shareholders and representatives of Brainstorm Cell, seek restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary and contractual duties.

374. Plaintiffs, on behalf of Brainstorm Cell, have no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Abuse of Control

375. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

376. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Brainstorm Cell, for which they are legally responsible.

377. As a direct and proximate result of the Individual Defendants' abuse of control, Brainstorm Cell has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

378. Plaintiffs, on behalf of Brainstorm Cell, have no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

379. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

380. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Brainstorm Cell in a manner consistent with the operations of a publicly-held corporation.

381. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Brainstorm Cell has sustained and will continue to sustain significant damages.

382. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

383. Plaintiffs, on behalf of Brainstorm Cell, have no adequate remedy at law.

**SIXTH CLAIM**

**Against the Individual Defendants for Waste of Corporate Assets**

384. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

385. As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

386. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

387. Plaintiffs, on behalf of Brainstorm Cell, have no adequate remedy at law.

**SEVENTH CLAIM**

**Against Defendants Lebovits, Lindborg, and Kern for Contribution Under Sections 10(b) and 21D of the Exchange Act**

388. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

389. Brainstorm Cell and Defendants Lebovits, Lindborg, and Kern are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Lebovits's, Defendant Lindborg's, and Defendant Kern's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

390. Defendants Lebovits, Lindborg, and Kern, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

391. Accordingly, Defendants Lebovits, Lindborg, and Kern are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

392. As such, Brainstorm Cell is entitled to receive all appropriate contribution or indemnification from Defendants Lebovits, Lindborg, and Kern.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiffs may maintain this action on behalf of Brainstorm Cell, and that Plaintiffs are an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Brainstorm Cell;

(c) Determining and awarding to Brainstorm Cell the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Brainstorm Cell's and the Individual Defendants to take all necessary actions to reform and improve Brainstorm Cell's corporate governance and internal procedures to comply with applicable laws and to protect Brainstorm Cell and its shareholders

from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Brainstorm Cell to nominate at least three candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e) Awarding Brainstorm Cell restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: August 10, 2026

**BRAGAR EAGEL & SQUIRE, P.C.**
*/s/ J. Brandon Walker*
J. Brandon Walker
Lawrence P. Eagel
Melissa A. Fortunato
810 Seventh Avenue, Suite 620
New York, NY 10019
Telephone: (212) 308-5858
Facsimile: (212) 214-0506
Email: walker@bespc.com
Email: eagel@bespc.com
Email: fotunato@bespc.com

*Co-Lead Counsel for Plaintiffs*

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Co-Lead Counsel for Plaintiffs*

**HYNES & HERNANDEZ, LLC**
Michael J. Hynes
Ligaya Hernandez
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Telephone: (484) 875-3116
Email: mhynes@hh-lawfirm.com
Email: lhernandez@hh-lawfirm.com

*Additional Counsel for Plaintiff Serge Andrev*

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Email: peretz@bgandg.com
Email: etiank@bgandg.com

*Additional Counsel for Plaintiff John Duncan Hamby*

**VERIFICATION**

I, Serge Andrev, hereby verify that I have authorized the filing of the attached Verified Amended Consolidated Shareholder Derivative Complaint ("Complaint"). I have reviewed the allegations made in the Complaint, and as to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and, for that reason, believe them to be true. I further verify that I am a current holder, and have been a holder, of Brainstorm Cell Therapeutics, Inc common stock at all relevant times.

Executed this 6 day of August 2026.

SergeAndrev
SergeAndrev (Aug 6, 2026 13:58:02 CDT)
Serge Andrev

# VERIFICATION

I, Barry Holtzman, am a plaintiff in the within action. I have reviewed the allegations made in this Amended Consolidated Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 5__ day of August, 2026.

DocuSigned by:
BARRY HOLTZMAN
B69731CAF50E43A...
_______________________
Barry Holtzman

# VERIFICATION

I, John Duncan Hamby, am a plaintiff in the within action. I have reviewed the allegations made in this Amended Consolidated Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 5__ day of August, 2026.

DocuSigned by:
John Duncan Hamby
A36279D1988A4F2...

John Duncan Hamby